[Crim. No. 3520.  First Dist., Div. One.  June 1, 1959.]

THE PEOPLE, Respondent, v. BERNARD BEN FELDMAN, Appellant.

Charles O. Morgan, Jr., for Appellant.

Stanley Mosk, Attorney General, Clarence A. Linn, Assistant Attorney General, and Peter T. Kennedy, Deputy Attorney General, for Respondent.

TOBRINER, J.—Appellant was convicted of (1) violation of Penal Code, section 182, for conspiracy to commit grand

theft (Pen. Code, §§ 484, 487) and to receive stolen property (Pen. Code, § 496) under Count I of the indictment, (2) violation of Penal Code, section 496, under Count II and (3) violation of Penal Code, section 496, under Count III. He was sentenced for the term prescribed by law (one to ten years) on all three counts, the sentences to be served concurrently.

We shall first recite the facts of the case and then consider separately the convictions under each of the three counts. Lastly we analyze appellant's arguments that one of the instructions given was prejudicial and that section 496 of the Penal Code is at least in part unconstitutional.

The persons involved in this case were engaged in the auto wrecking business. As the owner of Ben's Auto Wreckers, appellant bought, sold and dismantled used cars. Robert McClerkin, Homer McClerkin and Homer Drummond carried on a similar business although they had no license to do so. The McClerkins made use of Gordon Morgan as a "sort of salesman," who apparently, on a commission basis, sold stolen automobile parts procured by the McClerkins. During the month of May, 1957, Morgan sold appellant stolen parts; appellant knew that these were stolen parts.

The facts of the case fall into three categories: a series of events leading up to appellant's sale to the McClerkins of license plates, a pink slip and identification of a wrecked Ford; a series of events culminating in appellant's sale to the McClerkins of license plates, pink slip, locks and identification of a wrecked Mercury and a final series of events leading up to the disposal of a stolen Ford and a stolen Mercury.

The first sequence begins with the advent of the McClerkins and Morgan at appellant's place of business in May, 1957. The McClerkins had purchased a stolen 1957 Ford. On appellant's lot there stood an identical wrecked 1957 Ford. Morgan asked appellant how much he wanted for the wrecked Ford. Appellant replied $1,150. Appellant finally agreed to sell the. McClerkins the license plates, pink slip and identification of the wrecked Ford for $700. Appellant retained the Ford itself with the right to dispose of it for his own profit. No money and no papers changed hands; the parties merely entered into the agreement.

When, to keep the agreement, Homer McClerkin and Morgan came back to appellant's lot, Morgan made the crucial statement to appellant that they had a stolen Ford. But the McClerkins had not been able to raise the $700 nor had appellant·

obtained the pink slip from the insurance company from which he had purchased the wrecked Ford. Taking $500 as a down payment, appellant delivered to Homer McClerkin and Morgan the license plates and identification from the doors of the Ford and promised to turn over the pink slip as soon as he received it.

The license plates were exchanged. The valid license plate from the wrecked Ford (No. BWL 922) was placed on the stolen Ford. The rear license plate of the wrecked Ford, however, was badly burned; consequently it was wrapped in a May 29, 1957, edition of the San Francisco EXAMINER and placed in the trunk of the stolen Ford. Later, on June 7, 1957, a police officer saw a 1957 Ford with the license number BWL 922 pull away from the curb in front of Homer McClerkin's home.

The series of events as to the Mercury are reminiscent of those as to the Ford. The McClerkins had purchased a stolen 1953 Mercury. Appellant had in his lot an identical wrecked 1953 Mercury. Again, the McClerkins and Morgan, this time on June 5, 1957, approach appellant. Following the previous pattern, appellant agrees to sell the valid license plates, pink slip, locks and identification of the wrecked Mercury. Appellant gives Robert McClerkin a bill of sale to the Mercury and within the next day or so Robert McClerkin and Morgan return to take the license plates, pink slip, and locks. During this operation appellant tells Robert McClerkin and Morgan, "Make sure you have everything." Again, appellant agrees to dispose of the wrecked Mercury for his own benefit.

We come now to the final episode of the disposal of the stolen cars. Robert McClerkin was arrested on June 7, 1957, and on that night Morgan phoned appellant to tell him of that fact. Appellant said to Morgan, "Don't say anything and I won't say anything." On June 10, 1957, Homer McClerkin and Homer Drummond were arrested. The following day Morgan phoned appellant to tell him of the arrest, saying that the McClerkins wanted to get rid of the stolen Ford. When Morgan said that he refused to touch the Ford, appellant told Morgan, "Well, I'll get rid of it."

On June 11, 1957, appellant closed his business at an earlier hour than usual and went with Morgan to pick up the stolen Ford. Appellant then took the significant step of taking the Ford and driving it to San Mateo. Morgan, who was driving appellant's car, followed; Morgan's wife in turn followed him, driving Morgan's car. When he arrived in San Mateo, appel-

lant pulled the car to the curb, Morgan parking appellant's car behind it. Morgan then joined his wife and returned in his car to San Francisco.

On June 14, 1957, a Millbrae police officer found the stolen Ford abandoned in Millbrae. Lee Cole, a special agent of the National Automobile Theft Bureau, examined the trunk of the stolen Ford and found the burned license plate (BWL 922) wrapped in the San Francisco EXAMINER of May 29, 1957.

On June 13, 1957, Cole, Officer Ed Hodgers of the San Francisco Police Department and Jack Thelan of the California Highway Patrol, went to appellant's place of business and there they found a 1957 Ford without license plates or identification plates on the doors. They found, too, a partially dismantled 1953 Mercury for which appellant lacked license plates and a pink slip. The identification plates on the doors and the locks had been removed from this Mercury. Admitting at the trial that he was well acquainted with the law which requires that before an automobile be dismantled the license plates and pink slip be surrendered to the Motor Vehicle Department, appellant, when questioned by the police officers about the 1953 Mercury, stated "they caught me in a moment of weakness." To the question as to who "they" were, appellant described a young man. The police officers showed appellant pictures of the McClerkins and Drummond and appellant identified Robert McClerkin as the man to whom he sold the items missing from the 1953 Mercury.

The stolen 1953 Mercury was found abandoned near Cotati. Homer McClerkin admitted abandoning it there.

Under Count I, the charge that appellant participated in a wrongful conspiracy to commit grand theft and to receive stolen property breaks down into two parts. The first contends that appellant joined the conspiracy by agreeing to sell the license plates of the wrecked Ford for the purpose of placing them upon the stolen Ford and that by this concurrence appellant inferentially adopted the previous criminal acts of his fellow conspirators. The second aspect concerns appellant's apparent agreement, when he was informed of the arrest of one of the trio, "to get rid of" the stolen Ford. When appellant joined the plan of Morgan and Robert McClerkin to dispose of the stolen car, respondent argues that appellant entered into a conspiracy to receive the stolen property. Conviction on Count I must stand on either or both of these contentions.

As to the first contention, the record discloses that the theft occurred prior to the first appearance of appellant in the

whole matter. Before they even came to see appellant the McClerkins had obtained the stolen Ford. In a parallel situation with the Mercury, the same sequence occurred. Does appellant contract some retroactive liability by participation in transactions which occurred *after* the date of the receipt of the stolen goods by the McClerkins?

If, as wise commentators have suggested (see, for instance, Holmes, The Common Law (1881), p. 46), the mainspring of criminal sanction lies in its force as a deterrent, the sanction can hardly be applied retroactively by use of the conspiracy doctrine; and the decisions so hold.

The United States Supreme Court in *Bollenbach* v. *United States* (1946), 326 U.S. 607 [66 S.Ct. 402, 90 L.Ed. 350], reversed a conspiracy conviction in the face of evidence which established that the federal crime, which was the objective of the conspiracy, had been committed prior to defendant's joining of the conspiracy. In parallel fashion the Supreme Court of California, in *People* v. *Weiss* (1958), 50 Cal.2d 535 [327 P.2d 527], likewise rejected the contention that a conspirator is liable for criminal acts of his fellow conspirators committed prior to the time he joined the conspiracy. Indeed the court specifically disapproves of previous California cases upholding such convictions: "Implications in the language of the following cases that a defendant could be held retroactively liable for such a substantive offense are disapproved [citing cases]." (P. 566.) ■ While the court points out that evidence of prior criminal acts is admissible at a trial of the later conspirator, ". . . this is not to say that such a one becomes substantively liable for previous criminal acts of his fellow conspirators. . . . Rather, he 'adopts' the acts in the sense that evidence thereof is 'original evidence against [him]' . . . in a prosecution for the conspiracy or for a crime committed as an object of or in furtherance of or as a natural outgrowth of the conspiracy *after he joined it.*" (P. 566.)

■ Respondent's argument that appellant adopted the previous acts of his fellow conspirators, making him equally *guilty* with the McClerkins of receiving the stolen cars, runs directly into this specific ruling of *People* v. *Weiss, supra,* 50 Cal.2d 535. Indeed, that decision expressly disapproves as to this issue *People* v. *Brumback* (1957), 152 Cal.App.2d 386 [314 P.2d 98], the very case upon which respondent relies. Appellant did not agree to receive any stolen property as a part of his sale of the license plates of the Ford and the Mercury. Indeed, both the cars were already in the McClerkins'

possession, and the crime of receiving stolen property had already been committed. There can be no conspiracy to commit the past and completed act; appellant did not, and could not have joined the conspiracy for the consummation of an objective already accomplished.

Turning to the second aspect of the alleged conspiracy we examine the theory that appellant's agreement. to "get rid of" the Ford brought him under Count I.

The record shows that after the McClerkins and Drummond were released on bail, they wanted to give the Ford to Morgan so that evidence of the crime might be destroyed. But Morgan refused to take it.. Appellant instead agreed to dispose of the car. While Morgan, Robert McClerkin and appellant were thus involved in a punishable conspiracy to receive stolen property, which they proposed to liquidate, the question arises whether Count I properly describes such action as the indicted offense.

Section 1104 of the Penal Code provides that in a trial for conspiracy a defendant cannot be convicted unless the indictment or information expressly specifies one or more overt acts. Section 184 of the Penal Code defines an overt act as an act done to effect the object of the conspiracy.

The indictment describes the overt act in these terms: "Thereafter, in the City and County of San Francisco, in pursuance of and to carry out the object of the said conspiracy, Bernard Ben Feldman did deliver to Homer McClerkin, Robert McClerkin and Homer Drummond certain automobile license plates."

Clearly the overt act of agreeing to dispose of the car is not. synonymous with the overt act of delivering the license plates. Hence the indictment alleged as the overt act a different act than the proved overt act which related to the conspiracy. The fatally defective indictment fails to sustain conviction under Count I.

The conviction under Count II rests upon the language of the indictment: that appellant "did buy and receive, and did aid and abet and not being present did advise and encourage the buying and receiving of a 1953 Mercury sedan automobile . . . which had been stolen, knowing the same to have been stolen." The conviction must stand upon either of these two propositions, which we discuss separately, *infra*: that appellant received, or aided and abetted the receiving of, the stolen car knowing it to have been stolen or that he concealed, or aided in concealing the stolen property.

■ As to the receipt of the stolen Mercury, the record shows, as we have noted, that the McClerkins had obtained possession of the car before appellant's entrance upon the scene. Since the crime of receiving stolen property congeals upon taking possession of that property with guilty knowledge (*People* v. *Scott* (1951), 108 Cal.App.2d 231 at 233 [238 P.2d 659] ; *People* v. *Smith* (1954), 26 Cal.2d 854 at 859 [161 P.2d 941]) and since the aiding and abetting of that crime would call for the performance of the criminal act with ''guilty knowledge of the *wrongful purpose* of the perpetrator'' (*People* v. *Goldstein* (1956), 146 Cal.App.2d 268 at 273 [303 P.2d 892] ; emphasis added) the fact that the McClerkins had accepted illegal possession of the car before appellant even met with them precludes the conclusion that guilt attaches to him on either of these scores.

■ As to the second proposition, buttressed upon appellant's concealing or aiding in the concealing of the stolen goods, appellant's conviction again must rest upon the proposition that concealing or aiding in concealing stolen property is covered by the words of the indictment.

Section 950 of the Penal Code states: ''The accusatory pleading must contain . . . (2) A statement of the public offense or offenses charged therein.'' Further amplifying the test Penal Code, section 952, states: ''In charging an offense, each count shall contain . . . a statement, that the accused has committed some public offense therein specified . . .''

The decisions fortify the rule of the code sections. ■ That a person ''cannot be convicted of an offense (other than a necessarily included offense) not charged against him by indictment or information, whether or not there was evidence at his trial to show that he had committed that offense'' is the principle announced in *In re Hess* (1955), 45 Cal.2d 171, 174 [288 P.2d 5]. ■ While *People* v. *Williams* (1945), 27 Cal.2d 220, 225 [163 P.2d 692], holds that every fact or circumstance essential to the commitment of the charged crime must be alleged and proved, discrepancies as to technical or trifling matter do not furnish grounds for reversal. ■ *In re Hess* summarizes the issue in this sentence : ''Due process of law requires that an accused be advised of the charges against him in order that he may have a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial.'' (P. 175.) ■ The very essence of due process lies in notification to the accused of the nature of the charge against him.

Concealing or aiding in concealing the stolen property is manifestly not the same offense as receiving or aiding in receiving stolen property. The distinction between such forbidden conduct is not the trifling differential referred to in *People* v. *Williams, supra,* 27 Cal.2d 220. Neither is it an unsubstantial defect in the information or indictment upon which the ruling in *People* v. *Leiva* (1955), 134 Cal.App.2d 100 [285 P.2d 46], rests. This is a difference in substance (2 Wharton Criminal Law and Procedure (Anderson, 12th ed. 1955) 275); appellant was not properly apprised in advance of the specific charge.

Nor does it avail respondent to argue that the California Constitution, article VI, section 4½, providing that "[n]o judgment shall be set aside . . . unless . . . the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice" sustains the conviction of concealing stolen property because it was supported by the evidence. The argument demonstrates the very danger which due process seeks to avert. The fact that the accused, charged with one crime, may in the course of trial be found to have committed another, must not deprive him of the full opportunity for defense of the crime not charged.

Although the prosecution charged appellant with violation of Penal Code, section 496, the charge did not allege the offense of concealing stolen property. The conviction of Count II cannot be sustained.

The conviction on Count III rests upon the charge that the appellant "on or about the 28th day of May, 1957, at the City and County of San Francisco, State of California, did . . . receive . . . and . . . did advise and encourage . . . receiving of a 1957 Ford . . . which had been stolen, knowing the same to have been stolen."

Appellant took possession of the stolen Ford and drove it from San Francisco to San Mateo on June 11, 1957. Morgan had previously told appellant the Ford had been stolen. The fatal act of appellant lay in his acceptance of the car, with knowledge that it was stolen, even though he took it only to dispose of it. Here the essentials of the crime coexist; the forbidden act of the taking concurs with concomitant guilty knowledge. The facts of this case are very similar to those of *People* v. *Scott, supra,* 108 Cal.App.2d 231, 233, in which the court in holding defendant guilty of the crime pointed out: "After being told the facts, he took possession of and assumed control over the property, and proceeded to dispose of it. He

hid the tool chest and tools (which was also a violation of Pen. Code, § 496bb), and he disposed of the motor, either by selling it or by using it as security for a loan.'' Hence appellant's acceptance of the car constitutes the violation, and it is no defense that his action was not for personal gain. (*State* v. *Rushing* (1873), 69 N.C. 29 [12 Am.Rep. 641]. To the same effect, *People* v. *Smith, supra,* 26 Cal.2d 854.)

It does not avail appellant to contend that since the evidence showed appellant drove the Ford on June 11, 1957, and the indictment fixed the date of receipt as May 28, that the prosecution was required to elect as to which ''act'' it relied upon to support the charge.

In the first place, section 955 of the Penal Code provides that the precise time at which an accused committed an offense need not be alleged in the pleading unless time itself is a material ingredient of the offense. Obviously, the chronology here is not the vital point; the crux is the taking of stolen goods; whether such receipt occurred on May 28 or June 11 of 1957 is not vital. Finally, it would not be reversible error even if deemed error under article VI, section 4½, of the California Constitution.

In the second place, the cases cited by appellant involve situations in which the prosecution, having proved several disconnected culpable acts, was required to elect that one upon which it stood for conviction. In both *People* v. *Fremont* (1941), 47 Cal.App.2d 341 [117 P.2d 891], and *People* v. *Castro* (1901), 133 Cal. 11 [65 P. 13], in order to sustain the charge of rape the prosecution introduced proof of numerous acts of criminal sexual intercourse. The courts required the prosecution to elect the act, in each case, upon which it relied. In *People* v. *Hatch* (1910), 13 Cal.App. 521 [109 P. 1097], the prosecution proved the defendant committed several distinct embezzlements at different times and in different amounts. Again the court required an election. Each case has the common characteristic that the crimes charged were separate and distinct. In the instant case the transaction involving the 1957 Ford was continuing; the whole course and conduct of appellant as to the car made up a single thread of action.

We must sustain the conviction on Count III.

The last two points raised by appellant merit only brief discussion.

Contending that the instruction could relate only to the driving of the Ford on June 11, 1957, appellant argues the giving of the following instruction constituted prejudicial

error: ''[E]ven though a person is not aware that property is stolen when he first comes into possession of it, if he subsequently learns of its stolen nature and then conceals or withholds it from its true owner, he is guilty of a violation of Section 496 of the Penal Code.'' The argument, however, rests upon the contention that the prosecution was required to elect between the ''acts'' of May 28, 1957, and June 11, 1957. We have disposed of the argument in our discussion of Count III.

Appellant's second contention, that section 496 is unconstitutional because it fails to repeat the words ''knowing the same to be so stolen'' after the condemnation of concealment, cannot stand. In the first instance the word ''such'' modifying ''property'' relates to property which is stolen and known to be stolen. In the second instance the court's instruction that ''you are to consider all the instructions as a whole, and are to regard each in the light of the others,'' thereby incorporating the instruction given on subsequent concealment of the stolen property which did include the requirement of guilty knowledge, cured any conceivable defect to which appellant alludes.

We reverse the judgment as to Counts I and II and affirm the judgment as to Count III.

Bray, P. J., and Wood (Fred B.), J., concurred.

Petitions for a rehearing were denied July 1, 1959, and respondent's petition for a hearing by the Supreme Court was denied July 29, 1959.