[No. E011157. Fourth Dist., Div. Two. Oct. 4, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN ERIC ESQUIVEL, Defendant and Appellant.

1388

## Counsel

Corinne S. Shulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood and Kyle Niki Cox, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**DABNEY, Acting P. J.**—A jury convicted defendant John Eric Esquivel[1] of first degree murder (Pen. Code, § 187)[2] and found true the special allegation that a principal was armed with a firearm (§ 12022, subd. (a)(1)). The trial court sentenced Esquivel to a term of 25 years to life for the murder, plus a 1-year enhancement for the armed allegation.

On appeal, Esquivel contends the trial court erred in failing to instruct the jury that to find him liable for felony murder on an aider and abettor theory, it had to find he became an aider and abettor before the victim was fatally wounded. He also asserts that instructing the jury with CALJIC No. 2.15 violated his due process rights because the instruction allowed the jury to infer his guilt of robbery from circumstances, i.e., possession of recently stolen property plus slight corroboration, that did not afford a rational basis for such inference. Finally, he notes that a clerical error appears in the abstract of judgment.

---

[1]Two other men, Damien Brown and Duane Wilson, were also charged in the information with murder. Their cases were severed for trial. Brown entered a plea of guilty to voluntary manslaughter and received a 13-year sentence. Wilson's trial took place after Esquivel's. It appears he was found guilty of being an accessory after the fact, for which he received a four-year sentence.

[2]All further statutory references are to the Penal Code unless otherwise indicated.

## FACTS

Thomas Cotanche returned to his home after work on March 22, 1991, and discovered the body of his 18-year-old daughter, Jenny. Jenny had not felt well that morning, and had stayed home alone.

Jenny's body was in the kitchen area. There was kielbasa on the counter, although Jenny did not usually prepare or eat kielbasa. Jenny had died from a gunshot wound to the head and from four blows to her head which fractured her skull. There were defensive bruises on her hands and forearms and bruises on the side of her torso consistent with her having been kicked while on the floor.

The upstairs master bedroom and a closet on the ground floor had been ransacked. The master bedroom door was usually locked, but the key was kept hidden on a shelf nearby. Several shotguns and rifles were missing from the downstairs closet. A handgun, jewelry, and coins were missing from the bedroom. A compact disc player was taken from the den, and some compact discs were taken from Jenny's bedroom.

There were no signs of forced entry into the house. Shoe impressions leading away from the house were found in damp soil behind the house. The impressions matched the pattern of the shoes Esquivel was wearing when he was arrested on April 5, 1991. It was stipulated that the shoes were of a fairly common brand and size.

Esquivel had been acquainted with Jenny and had been to her house several times with his girlfriend, Mary Walmsley. Walmsley was the sister of Jenny's best friend. Jenny sometimes entertained friends in her bedroom, and her friends frequently wrote with markers on the three mirrored closet doors. After her murder, the following names, among others, were written on the mirrors: "H.L.O.S.T.," which was Esquivel's nickname; "Thumper," which was Brown's nickname; and "Sperm," which was Wilson's nickname. Mrs. Cotanche testified those names had not been on the door when she left for work the morning of the murder. Mrs. Cotanche had last seen Esquivel and Walmsley in Jenny's room on March 19, 1991. Walmsley testified she and Esquivel had written the names a few days before the murder when they had been at Jenny's house. After his arrest, Esquivel told the police he had written the names sometime in the past.

Esquivel's father came home for lunch on March 22, 1991, around noon. Esquivel was there with Wilson and Brown. After Wilson and Brown left, Esquivel told his father Jenny had been killed.

The evening of Jenny's murder, Esquivel went to Domanique Toney's house where Walmsley lived. Esquivel told Toney that Jenny was dead, her body had been found in the kitchen, and the police had let him view it. Esquivel told Walmsley that he, Wilson, and Brown had gone to Jenny's house that morning. They were watching television in the living room while Jenny was in the kitchen. Jenny asked Wilson to leave because she believed he had been involved in the theft of a credit card from her earlier in the year. Esquivel also told Wilson to leave. Wilson started to leave, but then got into an argument with Jenny and began beating her on the head with a gun. Wilson asked Brown and Esquivel to shoot her; they each said, "Not me." Wilson then shot her in the head. Esquivel described Jenny's body as lying half in the kitchen and half on the living room rug. That was the position her body was in when discovered by her father.

Esquivel laughed and joked when he related those events to Toney and Walmsley. Esquivel handed Toney a gun and asked her to hide it for him. Walmsley had not seen the gun before that night.

Officers searched Esquivel's house pursuant to a search warrant on April 5, 1991. They found two of Mr. Cotanche's shotguns (the barrels of which had been shortened), one of his rifles, and his handgun. None of those weapons was the murder weapon. It was stipulated that the murder weapon was recovered from someone other than Esquivel. The end portion of a shotgun barrel was found in a search of Wilson's house.

While the officers were executing the search warrant, Esquivel told them Wilson and Brown had committed the murder. He insisted he had been at his home at the time of the murder. The interrogating officer, bluffing, told Esquivel he knew Esquivel had been at the Cotanches' house during the murder. Esquivel then admitted being present when Jenny was beaten. He said Brown and Wilson had held a gun to his head and told him they would kill him if he said anything about the killing. He claimed he had left the Cotanches' house when the beating began. He said he had run down the hall toward the garage, into the garage, through the side door, and over the back fence. The officer, still bluffing, said that bloodstains had been found on Esquivel's shoes. Esquivel said that Wilson might have been wearing his

shoes. He then said he was standing near Jenny when the beating took place, and he tried to get out through locked French doors in the dining area. He said the beating began after he told Wilson Jenny wanted Wilson to leave because of the credit card problem. Wilson started to leave, but then came back and began to hit Jenny.

He told the officer he had gone to the house that morning to see Walmsley. Although he had not previously arranged to meet Walmsley, he had intended to call her from Jenny's house. He had tried to call Jenny three times that morning, but she had not answered the telephone. He nonetheless thought she was home because she might have been outside smoking. She had called him earlier that morning when he was still asleep, and he had told her he would call her back.

Brown and Wilson drove him to Jenny's house and dropped him off at the end of the street. He believed they were going to go to a high school to look for girls. He thought they had no intention of going to Jenny's house. He went inside Jenny's house and used the upstairs bathroom. When he came downstairs, Wilson and Brown were coming in through the back door.

He did not come to Jenny's aid because he was afraid of Wilson and Brown. After the crimes, Wilson had brought the guns to his house and told him to watch them for him.

DISCUSSION

I

*Felony-murder Instructions*

Esquivel contends the trial court erred in failing to instruct the jury sua sponte that if Esquivel became an aider and abettor to a robbery after the victim had already been fatally wounded, he could not be found guilty of felony murder. The case was submitted to the jury solely on a felony-murder theory.

The People respond that the instructions given correctly stated the law; the evidence did not support Esquivel's proposed instruction; and the court had no sua sponte obligation to give an instruction on the timing of Esquivel's intent.

## A. *Application of Felony-murder Doctrine.*

The court instructed the jury on general principles of felony murder and aider and abettor liability. (CALJIC Nos. 8.10,[3] 8.21,[4] 8.27);[5] on the concurrence of act and specific intent (CALJIC No. 3.31);[6] and on the definition of robbery.[7] Finally, the court instructed the jury on aider and abettor liability with respect to robbery.[8] However, Esquivel contends that the jury should also have been instructed that the felony murder doctrine did not apply unless the jury found that Esquivel formed the intent to participate in the robbery before Jenny was killed.

---

[3]The jury was instructed, based on CALJIC No. 8.10, as follows: "The defendant is accused in Count I of the Information of having committed the crime of murder, a violation of Penal Code Section 187. [¶] Every person who unlawfully kills a human being during the commission of robbery, in violation of Section 211 of the Penal Code, a felony inherently dangerous to human life, is guilty of the crime of murder, in violation of Section 187 of the Penal Code. [¶] In order to prove such crime, each of the following elements must be proved: Number one, a human being was killed; [¶] Number two, the killing was unlawful; [¶] And number three, the killing occurred during the commission or attempted commission of robbery, a felony inherently dangerous to human life."

[4]The jury was instructed, based on CALJIC No. 8.21, as follows: "The unlawful killing of a human being, whether intentional, unintentional, or accidental, which occurs during the commission or attempted commission of the crime of robbery is murder of the first degree when the perpetrator had the specific intent to commit such crime. [¶] The specific intent to commit robbery and the commission of such crime must be proved beyond a reasonable doubt."

[5]The jury was instructed, based on CALJIC No. 8.27, as follows: "If a human being is killed by any one of several persons engaged in the commission of the crime of robbery, all persons who either directly and actively commit the act constituting such crime or who have knowledge of the unlawful purpose of the perpetrator of the crime with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission[,] are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental."

[6]The court instructed the jury based on CALJIC No. 3.31: "In the crime of felony murder involving robbery, there must exist a joint—union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless such specific intent exists, the crime to which it relates is not committed. [¶] The crime of felony murder requires the specific intent to commit a robbery."

[7]The court instructed the jury based on CALJIC No. 9.40: "Every person who takes personal property in the possession of another against the will and from the person or immediate presence of that person accomplished by means of force or fear and with the specific intent permanently to deprive such person of such property is guilty of the crime of robbery. . . . [¶] In order to prove such crime, each of the following elements must be proved: Number one, a person had possession of property of some value, however slight; [¶] Number two, such property was taken from such person or from her immediate presence; [¶] Number three, such property was taken against the will of such person; [¶] Number four, the taking was accomplished either by force, violence, fear, or intimidation; [¶] And five, such property was taken with the specific intent permanently to deprive such person of the property."

[8]The court instructed the jury based on CALJIC No. 9.40.1: "For the purpose—purposes of determining whether a person is guilty as an aider and abettor to robbery, the commission of

The information did not charge Esquivel with robbery, but only with murder. The People did not attempt to prove that Esquivel himself was the killer; rather, the People's theory at trial was that Esquivel was guilty of felony murder as an aider and abettor of the robbery.

The prosecutor argued to the jury that Jenny was already dead when the property was taken, but that if Esquivel participated in taking property, he was guilty of felony murder, even if he did not join the plan to rob until after the murder, so long as Wilson did plan to rob Jenny before the murder.[9] The prosecutor proposed the scenario of Wilson's pulling out a gun, shooting Jenny, and then suggesting the robbery to Esquivel. According to the prosecutor's theory, if Esquivel did not then opt out, he was guilty of felony murder.[10]

The People contend, based on *People* v. *Cooper* (1991) 53 Cal.3d 1158 [282 Cal.Rptr. 450, 811 P.2d 742], that the instructions given and the argument based on those instructions correctly stated the law. In *Cooper*, the court held that ". . . the commission of a robbery for purposes of determining aider and abettor liability continues until all acts constituting the robbery have ceased." (*Id.* at p. 1161.)[11] Thus, the court concluded, "The asportation, the final element of the offense of robbery, continues so long as the stolen property is being carried away to a place of temporary safety. Accordingly,

---

the crime of robbery is not confined to a fixed place or a limited period of time and continues so long as the stolen property is being carried away to a place of temporary safety."

We note that the Use Note to CALJIC No. 9.40.1 (1991 new) (5th ed. pocket pt.) page 189 states that this instruction is not to be used for felony-murder purposes. Rather, CALJIC No. 9.44 (1991 rev.) (5th ed. pocket pt.) should be used.

[9]The prosecutor argued, "Question three, did the defendant participate in the robbery? If so, then the defendant is guilty of first-degree felony murder. [¶] A couple comments on timing. When we're back at question one, we're talking about the killer, whoever he is, there we're talking about having to have this intent to steal, this motivation during the time of the acts which caused the death. Does he have to be a participant in the robbery before the killing? Question three, the answer is no."

[10]The prosecutor argued, "Example: Again, this is not what the evidence shows at all, just to illustrate the point. All four of these individuals, Jennifer, Damien, Duane, John, are sitting watching television, peaceful as can be. Suddenly, for no reason, Duane Wilson pulls out a gun and shoots and kills Jennifer. [¶] The defendant and Damien Brown are in total shock. They had no idea this would happen. Then they ask him, 'Why did you do this?' And he said, 'Oh, I don't like Jennie, never did, and I was sitting here thinking wouldn't it be nice to go up and get some of that nice jewelry her mom has. So I decided yeah, I'll kill her.' [¶] He's the killer, and now these two have a choice in my hypothetical. They have a choice. Everyone has a choice. You are in or you're out. It's that simple. If they're in, they stay, they participate, they look for property, they take what they want, they take it home, they split it up. They're in. [¶] If they're out, they're calling 911. They're seeking help. In or out, the most important choice John Esquivel had to make in his life, and he chose in, and he's guilty of felony murder."

[11]We observe that the concept of the duration of an offense for purposes of aider and abettor liability and felony-murder liability is a developing issue in the context of various

in order to be held liable as an aider and abettor, the requisite intent to aid and abet must be formed *before or during such carrying away of the loot to a place of temporary safety.* Therefore, a getaway driver who has no prior knowledge of a robbery, but who forms the intent to aid in carrying away the loot during such asportation, may properly be found liable as an aider and abettor of the robbery." (*Ibid.*, original italics.) The People contend that under *Cooper*, a defendant may be liable for felony murder if he joins a robbery as an aider and abettor even after the victim has already been killed.

*Cooper* established the extent of an aider and abettor's liability for a robbery based on his participation at any time before the crime is completed. However, *Cooper* did not address the liability of a participant in the robbery for a murder that was completed before the participant joined the crime. In the present case, two distinct crimes were involved: robbery and felony murder. As a general rule, "for purposes of culpability as a principal, a crime is completed when all of the statutory elements of the offense have been fulfilled by the perpetrator." (*People* v. *Brady* (1987) 190 Cal.App.3d 124, 132 [235 Cal.Rptr. 248], disapproved on another ground in *People* v. *Montoya, supra,* 7 Cal.4th at p. 1040.) The *Cooper* court stated, "[T]he offense does not end until all of the acts that constitute [the offense] have ceased." (*People* v. *Cooper, supra,* 53 Cal.3d at p. 1165, fn. 7.) Here, the acts constituting murder ceased when the victim was killed, even if the robbery was still ongoing.

In *People* v. *Asher* (1969) 273 Cal.App.2d 876, 888 [78 Cal.Rptr. 885], two codefendants involved in a robbery testified that a third codefendant shot the victim before there was any intent or plan to rob. The appellate court impliedly approved the instruction given in the trial court that the jury must find the perpetrator killed the victim in furtherance of the robbery and the codefendants either conspired to rob or aided and abetted the robbery *before* the fatal shot was fired. (*Id.* at p. 890, fn. 2.)

██ It is well established in case law that a conspirator cannot be held liable for a murder or other crime committed by coconspirators before he joined the conspiracy. (*People* v. *Marks* (1988) 45 Cal.3d 1335, 1345 [248 Cal.Rptr. 874, 756 P.2d 260]; *People* v. *Weiss* (1958) 50 Cal.2d 535, 566 [327 P.2d 527]; *People* v. *Brown* (1991) 226 Cal.App.3d 1361, 1372 [277 Cal.Rptr. 309].) Conspiracy and aiding and abetting have been described as "subspecies of the same general theory of complicity." (*People* v. *Luparello* (1986) 187 Cal.App.3d 410, 438, fn. 8 [231 Cal.Rptr. 832]; see also *People* v. *Croy* (1985) 41 Cal.3d 1, 12 [221 Cal.Rptr. 592, 710 P.2d 392]; *People* v.

crimes. (See *People* v. *Montoya* (1994) 7 Cal.4th 1027, 1045, fn. 9 [31 Cal.Rptr.2d 128, 874 P.2d 903].)

*Garewal* (1985) 173 Cal.App.3d 285, 296-302 [218 Cal.Rptr. 690].) Thus, just as a conspirator cannot be held liable for crimes committed before he became a conspirator, an aider and abettor should not be held liable for a homicide committed before he became an accomplice. In either instance, the defendant's later joinder does not aid or encourage the commission of the homicide. "If . . . the mainspring of criminal sanction lies in its force as a deterrent, the sanction can hardly be applied retroactively . . . ." (*People* v. *Feldman* (1959) 171 Cal.App.2d 15, 21 [339 P.2d 888].)

■ The purpose of the felony-murder rule is to deter felons from killing negligently or accidentally in the commission of the underlying crime. (*People* v. *Satchell* (1971) 6 Cal.3d 28, 34 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383]; *People* v. *Washington* (1965) 62 Cal.2d 777, 781 [44 Cal.Rptr. 442, 402 P.2d 130].) However, the felony-murder doctrine is disfavored and " 'should not be extended beyond any rational function that it is designed to serve.' " (*People* v. *Smith* (1984) 35 Cal.3d 798, 803 [201 Cal.Rptr. 311, 678 P.2d 886].)

■ California courts have consistently stated that if the design to take property from the victim is formed after the victim had already been killed or mortally wounded, the felony-murder doctrine does not apply. (See, e.g., *People* v. *Morris* (1988) 46 Cal.3d 1, 23, fn. 9 [249 Cal.Rptr. 119, 756 P.2d 843]; *People* v. *Carnine* (1953) 41 Cal.2d 384, 388 [260 P.2d 16]; see also *People* v. *Reynolds* (1986) 186 Cal.App.3d 988, 998-999 [233 Cal.Rptr. 596]; *People* v. *Asher, supra,* 273 Cal.App.2d at p. 887.)

These cases concerned the intent of the actual killer. It would be an anomalous result to hold that an aider and abettor who is not himself the killer, and who does not himself have an intent to steal until after the victim has been mortally wounded, may be guilty of felony murder if the person he is aiding and abetting intended to commit robbery before killing the victim. If a killer cannot be found guilty under the felony-murder doctrine if he does not form the intent to steal until after the victim is dead, neither should an aider and abettor be found guilty under that doctrine unless he had the intent to commit an independent felony before the victim was killed. We conclude the jury should have been instructed accordingly.

Although the People rely primarily on *Cooper* to support their position, a careful reading of *Cooper* actually supports the opposite result. In *Cooper,* the court held that a person who aided and abetted the perpetrator's escape aided and abetted the robbery if the escape was part of the asportation, an element of robbery. (*People* v. *Cooper, supra,* 53 Cal.3d at p. 1170.) However, if no loot was taken, the same person would be guilty of being an

accessory after the fact. (*Id.* at p. 1168.) This rationale further supports Esquivel's position. Although a robbery continues with the asportation of the loot, a murder ends with the death of the victim. As the *Cooper* court stated, "It is legally and logically impossible to both form the requisite intent and in fact aid, promote, encourage, or facilitate commission of a crime after the commission of that crime has ended." (*Id.* at p. 1164.)

We conclude that even if Esquivel could have been held liable as a robber based on his taking property after the victim's death, he cannot be retroactively culpable for the killing of the victim if it occurred before his becoming an aider and abettor. Any other holding would ignore the primary rationale for punishing aiders and abettors as principals, which is to deter them from aiding or encouraging the commission of offenses. (*People* v. *Cooper, supra,* 53 Cal.3d at p. 1168; *People* v. *Escobar* (1992) 7 Cal.App.4th 1430 [9 Cal.Rptr.2d 770].)

The instructions given to the jury predicated liability for murder upon a killing by one person who had the intent to commit a robbery when others aided and abetted him without reference to the time frame of such aiding acts. Thus, the instructions did not require the jury to find that Esquivel had the intent to commit robbery before the victim was killed.

### B. *Evidence to Support Instruction.*

■ The People maintain that the instruction for which Esquivel now argues was unnecessary because it was not supported by the evidence. They contend that Esquivel's fundamental premise, i.e., that the prosecutor argued that Esquivel formed the intent to rob after Jenny s dead, was unsupported in the record, because the prosecutor posited that the intent to rob was formed before Esquivel arrived at the Cotanche house that morning.

However, as noted in footnotes 9 and 10, *ante*, the prosecutor argued alternative scenarios, including the hypothesis that Esquivel participated in taking property after Wilson had already killed Jenny. As the trial court observed, there was no testimony "that would show there was an intent upon entering the property to commit a felony or anything that would lead to burglary, all the elements of the burglary, . . ."

The evidence in the record could reasonably support an inference that Esquivel did not form the intent to participate in the robbery until after the victim was dead. Esquivel told Walmsley that Wilson had suddenly attacked Jenny after being asked to leave because of his suspected involvement in the theft of her credit card. Esquivel told a police officer a similar version of the

events leading to Jenny's death. Jenny had apparently been preparing food for Esquivel before she was killed, because she herself did not usually eat kielbasa, which was found on the kitchen counter. Esquivel told the officer he was afraid when the beating began and tried to run away. He first said he ran down the hall and out through the garage. He later said he tried to get out through a.locked French door near Jenny's body.

This evidence would reasonably support an inference that Esquivel did not form an intent to participate in the robbery until after Jenny's death. We conclude the evidence was sufficient for the jury to be instructed on the timing of Esquivel's intent.

C. *Necessity for Sua Sponte Instruction.*

The People argue that the court had no sua sponte duty to instruct the jury on the timing of Esquivel's participation. To support this argument, they rely on *People* v. *Hayes* (1990) 52 Cal.3d 577 [276 Cal.Rptr. 874, 802 P.2d 376] and *People* v. *Hendricks* (1988) 44 Cal.3d 635 [244 Cal.Rptr. 181, 749 P.2d 836].

In *Hendricks,* the defendant argued the trial court had erred by failing to instruct the jury on the defendant's request as follows: " 'If you have a reasonable doubt whether the defendant formed an intent to steal from [the victims] before they were shot, then you are instructed that [the victims] were not killed in the perpetration of . . . the crime of robbery.' " (*People* v. *Hendricks, supra,* 44 Cal.3d at pp. 642-643.) The Supreme Court rejected the defendant's contention of error. The court explained the refused instruction merely elaborated upon CALJIC Nos. 8.21 and 9.10, both of which had been given to the jury. Those instructions adequately covered the issue of the time of formation of the defendant's intent to steal, and the trial court thus did not err in refusing the proffered instruction. (44 Cal.3d at p. 643.)

In *People* v. *Hayes, supra,* 52 Cal.3d 577, the court rejected a claim of error similar to that raised in *Hendricks.* As in *Hendricks,* the jury in *Hayes* had been instructed with CALJIC Nos. 8.21 and 9.10. The court found no error in the refusal to give the proffered instruction. (*Hayes, supra,* 52 Cal.3d at p. 629.)

Esquivel contends the trial court had a duty to instruct the jury sua sponte on the timing of his intent to participate in the robbery. Esquivel finds support for his position in *People* v. *Marks, supra,* 45 Cal.3d 1335. In that case, the court stated, "A conspirator cannot be held liable for a substantive offense committed pursuant to the conspiracy if the offense was committed

*before* he joined the conspiracy. [Citations.] The trial court, however, did not instruct the jury that it must find defendant joined the conspiracy before the murder. A trial court has a sua sponte duty to instruct on the general principles of law relevant to the issues raised by the evidence. [Citation.] There was evidence suggesting that defendant did not join the alleged conspiracy until after the murder." (*Marks, supra,* 45 Cal.3d at p. 1345, original italics.)

In *Hendricks* and *Hayes,* the court concluded that the general instructions given adequately informed the jury of pertinent legal principles, specifically, the timing of the defendants' intent. Thus, the defendants were not entitled to have the jury instructed with repetitive instructions. Here, however, *no* instruction given informed the jury that *Esquivel* had to have formed the intent to participate in the robbery before the murder was committed in order to be found guilty of felony murder. Rather, the instructions focused on the perpetrator's intent. Unlike the situation in *Hendricks* and *Hayes,* other instructions given did not adequately inform the jury of the relevant legal principles. Thus, the court had a sua sponte duty to instruct the jury on the timing of Esquivel's intent. (See *People* v. *Marks, supra,* 45 Cal.3d at p. 1345; cf. *People* v. *Escobar, supra,* 7 Cal.App.4th at p. 1435 [court has a sua sponte duty to instruct that an aider and abettor's intent must have been formed before or at the time of the burglar's entry when the evidence supports an inference the defendant did not learn of the perpetrator's purpose until after the perpetrator left the building].)

D. *Effect of Error.*

"Conflicting or inadequate instructions on intent are closely related to instructions that completely remove the issue of intent from the jury's consideration, and, as such, they constitute federal constitutional error. [Citation.]" (*People* v. *Macedo* (1989) 213 Cal.App.3d 554, 561 [261 Cal.Rptr. 754], disapproved on another ground in *People* v. *Montoya, supra,* 7 Cal.4th at p. 1040.) Thus, we determine whether the instructional ambiguity is harmless beyond a reasonable doubt under the *Chapman*[12] standard. (*Ibid.*)

The United States Supreme Court explained the *Chapman* test as follows: "Harmless-error review looks . . . to the basis on which 'the jury *actually rested* its verdict.' [Citation.] The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered

---

[12]*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].

in *this* trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee. [Citations.]" (*Sullivan* v. *Louisiana* (1993) 508 U.S. __ [124 L.Ed.2d 182, 188-190, 113 S.Ct. 2078, 2081-2082], original italics.)

■ Here, under the instruction given, the jury could have convicted Esquivel of felony murder either on the inference he knew of Wilson's intent to rob before Jenny was killed or on the inference he formed the intent to aid in the robbery after Jenny was killed. The instructions failed to give the jury the opportunity to decide whether Esquivel had the requisite intent before or after the killing, and argument of the prosecutor compounded the defect. We have no way of knowing if the verdict rested on the permissible or on the impermissible theory. Thus, we conclude the instructions were prejudicial.

II

*CALJIC No. 2.15*

■ Esquivel contends it was error for the trial court to instruct the jury with CALJIC No. 2.15.[13] Esquivel contends his due process rights were violated by the giving of CALJIC No. 2.15 because the instruction allowed the jury to infer guilt without any rational connection between such a conclusion and the facts from which it was gleaned. Although we conclude that reversal of the conviction is required on other grounds, we address this contention briefly for the guidance of the trial court on remand.

Division One of the Fourth District has previously rejected a constitutional challenge to CALJIC No. 2.15 similar to the one Esquivel raises in this case. (*People* v. *Anderson* (1989) 210 Cal.App.3d 414, 426-432 [258 Cal.Rptr. 482].) The court explained that the inference permitted by CALJIC No. 2.15 is permissive, not mandatory. (210 Cal.App.3d at p. 430.) A permissive inference empowers a jury to credit or reject the inference based on its evaluation of the evidence and does not relieve the prosecution of any

---

[13]As given in this case, CALJIC No. 2.15 stated, "If you find that the defendant was in conscious possession of recently stolen property, the fact of such possession is not, by itself, sufficient to permit an inference that the defendant is guilty of the crime of robbery, in violation of Section 211 of the Penal Code. Before guilt may be inferred, there must be corroborating evidence tending to prove defendant's guilt. However, this corroborating evidence need only be slight and need not, by itself, be sufficient to warrant an inference of guilt. [¶] As corroboration, you may consider the attributes of possession, time, place, and manner that the defendant had an opportunity to commit the crime charged, his false or contradictory statements, if any, or any other evidence which tends to connect the defendant with the crime charged."

burden of establishing guilt beyond a reasonable doubt. (*People* v. *Roder* (1983) 33 Cal.3d 491, 497-498 [189 Cal.Rptr. 501, 658 P.2d 1302].) The prosecutor's use of a permissive inference comports with due process unless there is no rational way for the jury to make the logical connection which the presumption permits. (*Ulster County Court* v. *Allen* (1979) 442 U.S. 140, 157 [60 L.Ed.2d 777, 792-793, 99 S.Ct. 2213].)

Here undisputed evidence of possession of stolen property was as follows: the police found two of Mr. Cotanche's shotguns, one of his rifles, and his handgun hidden in Esquivel's house.

Evidence corroborating Esquivel's involvement in the robbery was as follows: attempts had been made to remove the serial numbers from the weapons, and the barrels of the shotguns had been shortened; Esquivel admitted he had been present when Jenny was beaten and killed; he initially falsely told the police that he had been at his own home when the murder took place. This evidence was sufficient to corroborate the inference of guilt from the possession of the stolen property. (*People* v. *Mosqueira* (1970) 12 Cal.App.3d 1173, 1176 [91 Cal.Rptr. 370].) Thus, the jury could rationally make the inference that the presumption permits.

### III

### *Abstract of Judgment*

The abstract of judgment contains an apparent clerical error, conceded by the People, in that it states that Esquivel was sentenced to a term of life without possibility of parole rather than to a term of 26 years to life. Our reversal of the conviction makes the matter moot.

### DISPOSITION

The judgment is reversed.

Hollenhorst, J., and Bigelow, J.,* concurred.

---

*Retired judge of the Los Angeles Superior Court sitting under assignment by the Chairperson of the Judicial Council.