Filed 6/25/15  P. v. Slaughter CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>LAWRENCE SLAUGHTER,<br><br>    Defendant and Appellant. | F067401<br><br>(Super. Ct. No. BF143850B)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Thomas S. Clark, Judge.

Mark L. Christiansen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Lawrence Slaughter (defendant) stands convicted, following a jury trial, of first degree murder during the commission of a robbery (Pen. Code,[1] §§ 187, subd. (a), 189, 190.2, subd. (a)(17); count 1), robbery (§ 212.5, subd. (c); count 2), and active participation in a criminal street gang (§ 186.22, subd. (a); count 3).[2] As to counts 1 and 2, the jury further found defendant committed the offense for the benefit of, at the direction of, or in association with a criminal street gang. (§ 186.22, subd. (b)(1).) Following a bifurcated court trial, defendant was found to have been previously convicted of a serious felony (§ 667, subd. (a)) that was also a strike (*id*., subds. (c)-(j), § 1170.12, subds. (a)-(e)) and to have served a prior prison term (§ 667.5, subd. (b)). The People not having sought the death penalty, defendant was sentenced to an unstayed term of life in prison without the possibility of parole plus six years, and was ordered to pay restitution, along with various fees, fines, and assessments.

We hold the evidence was sufficient to support the murder and robbery convictions, but not the robbery-murder special circumstance. We reverse, however, the murder conviction due to prejudicial error in the instructions to the jury. We hold the trial court did not abuse its discretion in denying a continuance of the sentencing for preparation of a motion for new trial based on newly discovered evidence. Accordingly, we vacate the special circumstance finding, reverse the conviction on count 1, and remand the matter for further proceedings.

---

[1]     All statutory references are to the Penal Code unless otherwise stated.

[2]     Defendant originally was jointly charged with Christopher Patterson and Maxamillion Lee McDonald, but their cases were severed. Only defendant's case is before us on this appeal.

2.

## FACTS

### *The Robberies and Homicide*

On August 18, 2012, Patrice Oliver was at FoodMaxx on Ming Avenue near Stine Road, Bakersfield, with her daughter.[3]  She was in the parking lot, approaching the trunk of her vehicle with her groceries, when she saw someone moving toward her at a rapid pace.  He was African-American, slightly stocky, an inch or two shorter than her height of five feet nine inches, and had short hair and very distinctive eyes.  She watched him the whole time he was coming toward her, then he walked past her so closely that he could have touched her.  A few seconds later, she was grabbed by the back of the neck.  The person grabbed her jewelry, shirt, bra, and hair.  He jerked her and she hit the pavement, injuring her hip and suffering cuts and scrapes as he dragged her about six feet while he tried to get her gold.  Although one of her necklaces remained intact, another one broke and she lost about 18 inches of gold chain.

Oliver did not report the robbery that day.  She was in shock and worried it would not be a top priority if she called the police, while in the meantime, she had a car full of groceries that could spoil because it was a hot day.  Also, she still had the necklace that meant the most to her.

On August 19, Letrecse Robinson was visiting the College Garden Apartments at 2600 Haley Street, where her mother lived.  The Foods Co parking lot was visible from there.

As of August 19, Robinson was one of McDonald's girlfriends.  She saw him at her mother's apartment that day with defendant (also known as "Lump").  Patterson (also

---

[3]    Unspecified references to dates in the statement of facts are to the year 2012.

    Although defendant was not charged with the Oliver robbery, the evidence was admitted against him pursuant to Evidence Code section 1101, subdivision (b).

    Oliver told Detective Stratton the robbery took place some time between 3:10 p.m. and 4:00 p.m.

known as "Baby Rose") was not with them, although Robinson did see him near the apartments.

Robinson owned a Toyota Camry, which she had loaned to Freddie Mae Jackson, McDonald's mother. On August 19, Robinson gave McDonald permission to borrow the vehicle, which was parked at the College Garden Apartments.

Anita Coleman, McDonald's sister, went to the apartment complex to pick up her daughter from Jackson's apartment after work. While she was there, she saw McDonald. She believed it was some time between 2:00 p.m. and 3:00 p.m. McDonald was with two of his friends, defendant and Patterson. Coleman had seen the three together three or four times before, usually at her or her mother's residence or the Elks Lodge.[4] McDonald usually drove Jackson's Buick, but it tended to overheat.

Jackson saw McDonald at her apartment that day, but to her knowledge, he was alone. The Buick was overheating, so she provided him with the keys to Robinson's Camry. Jackson told Stratton that she loaned the Camry to McDonald at approximately 6:30 p.m., and he returned it about 7:30 that same night.

Surveillance photographs from inside Foods Co showed defendant, Patterson, and McDonald in the aisle at the very back of the store at 6:22 p.m. McDonald was wearing a white shirt, yellow shorts, and a gray hat. Patterson was wearing khaki shorts and a black-and-gray-striped shirt. Defendant was wearing a gray shirt and blue jeans. The customer service area was at the very front of the store, just before the exit. Someone going from the rear aisle of the store to the exit would have to pass the customer service area if he or she was coming from the check stand area.

On August 19, Natalie Ramos took her 71-year-old mother, Guadalupe Ramos, to Foods Co to purchase Guadalupe's groceries.[5] With them was Natalie's daughter,

---

[4]     Coleman told Stratton the three were always together.

[5]     For clarity, members of the Ramos family are referred to by their first names. No disrespect is intended.

4.

Marisol. Natalie parked her vehicle near the front entrance. They all went into the store together, then Guadalupe sat by the customer service desk while Natalie and Marisol shopped for her. It took them 45 minutes to an hour, during which time Guadalupe remained seated by the customer service desk. They all then exited the store together.

Once outside, Natalie walked a bit ahead of Guadalupe so she could open the trunk of her vehicle and start loading the groceries. As Natalie was opening the trunk, she saw a dark shadow to her right. She turned; a person had Guadalupe in a choke hold with his left hand, while with his right hand, he pulled an 18- to 20-inch gold chain from around her neck and threw her to the asphalt on her back. She fell "pretty hard." Marisol saw the chain actually being broken off of Guadalupe's neck, then Guadalupe fell back and hit her head.

Natalie screamed, and the assailant, whom she described as African-American and wearing tan cargo shorts and a black-striped shirt, ran through the parking lot toward Haley.[6] Someone offered to call 911, and a man told Natalie he would follow the perpetrator. Natalie attended to her mother, and noticed blood on the back of her head. She picked Guadalupe up, because the ground was hot, but Guadalupe did not seem to know what was going on. Natalie put Guadalupe in the back seat of the car with her head in Marisol's lap. Guadalupe was breathing kind of hard. It took eight to 10 minutes for the ambulance to arrive, during which time Guadalupe remained unresponsive.

---

[6] Marisol described the person as an African-American male, wearing tan cargo shorts, a black-and-gray-striped shirt with a V-neck, and a hat. He approached Guadalupe slowly, in a "sneaky kind of way," and grabbed her necklace from the back, with both hands. Marisol had seen him sitting on the cement planter to the right of the store's front exit as she was walking out of Foods Co.

Jennifer Baltazar, a Foods Co employee, saw the man when he was sitting by the flower beds, just moments before she heard a lady screaming and saw the man run past her. He was wearing a hat, shorts, and a striped shirt. Shown surveillance photographs from inside the store, she identified the shirt worn by Patterson as the same shirt as was worn by the person on the planter. She also said the hat being worn by McDonald in the photographs was the same one she saw the suspect wearing.

Miguel Ulloa was driving into the Foods Co parking lot when he saw an African-American male in his late 20's walk up behind an elderly woman and pull her down to the ground. She hit her head on the pavement. The male was skinny, and wore khaki shorts and a shirt with black and silver horizontal stripes. Ulloa followed in his vehicle as the man ran toward the southwest side of the parking lot, where a gas station was located, then through the intersection of Height and Haley. The man made a left at the first corner, which was Gurley Street, and Ulloa lost sight of him.

On August 19, Octavio Cazares was living on Gurley Street, just off Height Street. He was walking to Foods Co when he saw a gray, four-door vehicle across the street from the house at the corner of Height and Gurley. The car was slowly rolling, then someone ran and jumped in. Cazares believed the person, who was African-American and wearing the same or a similar shirt as Patterson was wearing in the surveillance photograph taken inside Foods Co, came from the area of Foods Co. Cazares could not tell for sure, but believed there were two or three people inside the vehicle before the runner jumped in. The runner jumped into the back left of the car, then it quickly left.

Michael Cuellar lived on Gurley on August 19. That evening, he saw a silver-colored sedan — possibly a Toyota — stopped in the middle of the street in front of his house. He could not see the occupants of the car, which he had never seen on the street before. A couple of seconds after it came to a stop, however, he watched a male run straight into the car by cutting across the yard of one of the corner houses. The car then quickly left. This person was running from the direction of Foods Co. Cuellar believed he was wearing a baseball cap and a striped shirt that was very similar to the one Patterson was wearing in the surveillance photograph taken inside Foods Co.

The ambulance arrived at Foods Co at 6:58 p.m. Guadalupe presented with unresponsiveness, abnormal skin signs, and rapidly decreasing mental status. At first, she had a normal heart rate and rhythm, and her breathing was slow but adequate. During the approximately five-minute trip to Kern Medical Center, however, her breathing grew

6.

slower and shallow and had to be assisted by paramedics, and her heart rate began to drop. When she arrived at the hospital, she was in cardiac arrest. Medical personnel saw no external signs of trauma.

Despite receiving advanced cardiac life support care, Guadalupe was pronounced dead at 7:49 p.m. An autopsy showed contusions, bruises, and abrasions from neck to thigh on the right side of her body. Her heart was somewhat heavy in weight and showed signs of previous heart attacks. She had lung disease and minor fatty liver changes. The cause of death was cardiac dysrhythmia (irregular heartbeat) associated with the trauma to the trunk and extremities she sustained during the event. Essentially, Guadalupe was scared to death.

Surveillance photographs taken at 7:08 p.m. and 7:10 p.m. on August 19 at the Gasco at Mt. Vernon and East California showed McDonald pumping gas and defendant inside the store, purchasing Gatorade. Surveillance photographs from that date for the Ross Dress for Less store on Ming Avenue showed defendant, McDonald, and Patterson were still together later that evening.

As of August 19, Quintin Reyes Chico owned a jewelry repair shop where he also bought and sold gold. The shop was located at 1309 Chamberlain, Bakersfield, just inside the Harold Way entrance to Placita Las Americas, which also housed a number of other retail businesses. Reyes Chico's store was normally open from 10:30 a.m. to about 5:00 p.m., although Placita Las Americas remained open until about 7:00 p.m. If someone came into Reyes Chico's store to sell gold, Reyes Chico would test it to make sure it was gold, weigh it, and pay the person. The entire process took three minutes or less. For a smaller amount of gold such as a necklace, Reyes Chico would not ask for any identification.[7]

---

[7] Jess Bravo, who managed Placita Las Americas, watched Reyes Chico's business change from the selling of jewelry to gold. The clientele also changed; frequently, groups of Hispanic or African-American men would bring in jewelry boxes and empty

As of August 19, Dionshana Evans was one of McDonald's girlfriends. She lived in an apartment complex on Feliz. When she arrived home around 7:45 that evening, McDonald was standing in the parking lot area. She also saw defendant and Patterson in the area. Defendant had a lot of family on Feliz and was with them. Evans did not remember what he was wearing, but Patterson had on a white T-shirt and some shorts.[8]

McDonald was arrested at Evans's apartment shortly after 3:00 a.m. on August 20.[9] Later that morning, Oliver saw a report on the Foods Co incident on the morning news. She called the police, then spoke with a detective later that day. Shown photographs, she identified McDonald as the person who robbed her.

Defendant, a parolee deemed to be high risk due to his gang status, was required to wear a global positioning satellite (GPS) ankle monitor that collected information concerning his whereabouts approximately once a minute. The monitor was placed on defendant on August 13 and its accuracy verified. The VeriTracks system, a near real-time database that gave both current location and historical position ("tracks") via computer, was used by defendant's parole agent for monitoring purposes. GPS tracks for August 18, between 3:10 and 4:10 p.m., showed defendant in various locations within the FoodMaxx parking lot at Ming and Stine. He spent several minutes in one particular area near the front of the store at and around 3:31 p.m. GPS tracks subsequently showed him in the area of Harold Way. On August 19, he spent several minutes in and around the

---

them on the counter, and Reyes Chico would sort through the contents. Whatever he did not buy, the men would throw in the trash. Bravo ultimately terminated Reyes Chico's lease, because Placita Las Americas was family oriented, while Reyes Chico's clientele were intimidating, loud, and vulgar, and drew a number of complaints.

[8] Evans told Stratton that she saw McDonald with defendant and Patterson following the incident on August 19.

[9] Evans told Stratton that a few hours after McDonald's arrest, Patterson came to her apartment alone and spoke to her. Patterson said, "I don't know what they arrested Max for, I'm the one that took that chain and I'm still free." Defendant was arrested on August 22, while Patterson was arrested on September 4.

area of a vehicle in the Foods Co parking lot at and around 6:54 p.m., and was later in the area of Harold Way.

*The Gang Evidence*[10]

Bakersfield Police Officer Anderberg was assigned to the Special Enforcement Unit (SEU), a specialized unit within the police department whose primary objective was to investigate and analyze gang crime and gang violence. He had held that assignment approximately a year and a half as of the time of trial, but had over 15 years of law enforcement experience, during which he received training and experience with respect to gangs. Approximately nine years of his career involved patrolling the east side of Bakersfield, and he had received training regarding Kern County gangs in general and the East Side Crips in particular. He had also investigated cases involving members of the East Side Crips, and came into contact with members of that gang on almost a daily basis.

Anderberg described the East Side Crips' rival gangs, some of the subsets within the gang (including the East 11th Street Project Crips, the Spoonie G Crips, and the Stroller Boys), and the traditional boundaries of East Side Crip territory. Based on his training and experience, he opined the East Side Crips had approximately 550 active members as of August 2012, and their primary criminal activities were robbery, assault, weapons violations, gambling, burglary, loitering, narcotics, and drug sales.

Anderberg reviewed five offense reports (four of which involved defendant, McDonald, or Patterson) in regard to the East Side Crips' pattern of criminal gang activity. Based on his contacts and review of the cases, Anderberg opined the East Side Crips were engaged in an ongoing pattern of criminal activity.

Anderberg had spoken with gang members about why they committed crimes with more than just one person. He was told it helped them verify their commission of crimes

---

**10** Because defendant does not challenge admission of this evidence or claim the evidence was insufficient to sustain the conviction on count three or gang enhancements on counts 1 and 2, we omit many of the details presented to the jury.

for the gang. It also helped the crime be successful. If multiple people were involved, one could act as the lookout or the getaway driver while another one actually committed the crime. This increased the odds of them not being discovered by law enforcement. In addition, it intimidated victims and possible witnesses.

Anderberg explained that status or respect is gained within a gang by committing crimes and showing disrespect and disregard for the public and for law enforcement. When someone is out to gain status, he takes people who have status as gang members. This ensures that if they are caught, they will not snitch. Anderberg had also been told there was a hierarchy among age groups within the gang. Younger gang members are expected to do the more miniscule tasks and take more of a risk. Such persons are considered expendable because they have not yet been in prison or established their reputation with other gang members. Bragging on the street about committing a crime helps elevate status, because it shows the person is willing to commit acts for the gang, and a lack of regard for the public and the rules of society.

Anderberg reviewed offense reports and street checks concerning defendant, McDonald, and Patterson. McDonald had several tattoos showing membership in the East Side Crips and its Spoonie G subset, and disrespect toward rival gangs. In five of six jail bookings, he "claimed" Crip; in two, specifically East Side. McDonald's offense reports and street checks ranged from November 21, 2009 (on which date he admitted being an active member of the Spoonie G subset of the East Side Crips) to May 16, 2012 (when he told an officer it was common for East Side Crips to lie for other East Side Crips to protect them from the police). Based on his review of all the information, Anderberg opined McDonald was an active member of the East Side Crips on August 18 and 19.

Patterson also had tattoos indicating membership in a specific subset of the East Side Crips and disrespect toward rival gangs. In three of his jail bookings, he "claimed" Crip. In the booking of January 13, 2011, he "claimed" the Spoonie G subset.

10.

Patterson's offense reports and street checks ranged from May 27, 2010 (when he admitted membership in the East Side Crips) to August 12, 2012 (when he admitted being an active member of the East Side Crips, stated he was aware that other East Side Crip members were involved in ongoing criminal activities, and stated he specifically knew they regularly committed shootings and robberies). Based on all the information, Anderberg opined Patterson was an active member of the East Side Crips on August 19.

Defendant had several tattoos indicating membership in the East Side Crips. In 18 jail bookings between March 17, 2000, and August 22, 2012, he "claimed" East Side Crip. In six of the bookings from January 3, 2010, to August 22, 2012, he specifically "claimed" the 11th Street subset of the East Side Crips. Defendant's offense reports and street checks ranged from June 6, 2006 (when he told a deputy he was an East Side Crip) to July 20, 2012 (when he was contacted with another East Side Crip at an apartment complex where there had been increasing calls of shots fired and which was near a location frequented by a rival gang). From defendant's GPS tracks for August 18 and 19, it appeared defendant was frequenting the areas of the Elks Lodge, the Aneese Market, and Roy's Market, all common East Side Crip hangouts. Based on all the information, Anderberg opined defendant was an active member of the East Side Crips criminal street gang on August 18 and 19.

In answer to a hypothetical question based on the People's evidence in this case, Anderberg opined the robbery was in association with the East Side Crips criminal street gang, with a minor benefit. It was in association with the gang, because there were multiple East Side Crip members at a location together, conspiring to commit a robbery, which was one of the gang's primary criminal activities. In addition, with three or more members being together, they could increase their status individually or as to the gang as a whole. They could also multitask with multiple members present, and trust each other's loyalties. In addition, the younger gang member could show he was willing to put in work for the gang and help establish a reputation that he could be trusted for further

11.

criminal acts. The benefit to the East Side Crips would be that the members were willing to commit a brutal attack in full public view during daylight hours. This would cause intimidation and fear within the public, and there might also be a minor monetary gain from the value of the item that was taken. The gang would not benefit, however, from the age of the victim or her death.

Anderberg had spoken with gang members concerning the type of victims they chose to rob. They wanted something that would be easy, where they would be able to complete the offense with minimal risk to themselves, both in terms of actual harm to themselves or being caught. A byproduct of that was injury to the victim. With regard to this specific case, Anderberg had spoken to gang members who said it was "just the cost of doing business." However, other gang members said it was not what they did, and that they did not look for elderly victims.

On December 20, 2008, Officer Kroeker came into contact with defendant while conducting a compliance check at the Elks Lodge. Defendant admitted he was a member of the East Side Crips. He was wearing the gang's color and had knowledge of the gang's territorial boundaries and rivals, and crimes committed by the East Side Crips. He said those crimes were common knowledge among East Side Crips members. Defendant was asked whether, if one gang member was in possession of a gun in an area or a vehicle with a group of other gang members, everyone knew who had the gun. Defendant said that out of respect, the person with the gun had to let people know who was in possession of a firearm, because if something went bad, they had to know who had the gun. Asked if he knew if other gang members carried firearms, defendant responded affirmatively. As to how the East Side Crips made money, defendant said females paid for most of the things, but drug sales were another way. Defendant also said gang members shared money among themselves and helped each other out.

12.

# DISCUSSION

## I

### SUFFICIENCY OF THE EVIDENCE

Defendant challenges the sufficiency of the evidence to sustain the convictions on counts 1 and 2 and the jury's true finding on the special circumstance on count 1.

The applicable legal principles are settled. The test of sufficiency of the evidence is whether, reviewing the whole record in the light most favorable to the judgment below, substantial evidence is disclosed such that a reasonable trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that evidence which is "reasonable, credible, and of solid value." (*People v. Johnson*, *supra*, at p. 578.) An appellate court must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the credibility of the witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367). "Where the circumstances support the trier of fact's finding of guilt, an appellate court cannot reverse merely because it believes the evidence is reasonably reconciled with the defendant's innocence. [Citations.]" (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1747.) Reversal on the ground of insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) This standard of review is applicable regardless of whether the prosecution relies primarily on direct or on circumstantial evidence (*People v. Lenart* (2004) 32 Cal.4th 1107, 1125), and applies to special circumstances as well as substantive offenses (*People v. Cunningham* (2001) 25 Cal.4th 926, 1010).

13.

## A. The Substantive Offenses

"'Robbery is the taking of "personal property in the possession of another against the will and from the person or immediate presence of that person accomplished by means of force or fear and with the specific intent permanently to deprive such person of such property." [Citation.]' [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 943; see § 211.) "'"[A]ll the force that is required to make the offense a robbery is such force as is actually sufficient to overcome the victim's resistance ...."' [Citations.]" (*People v. Burns* (2009) 172 Cal.App.4th 1251, 1259.) "'If the other elements are satisfied, the crime of robbery is complete without regard to the value of the property taken.' [Citation.]" (*People v. Clark*, *supra*, 52 Cal.4th at p. 943.)

Defendant was tried on the theory he aided and abetted Patterson's robbery of Guadalupe, and so was liable for her murder under the felony-murder rule.[11] Conviction on such a theory "require[s] proof that an aider and abettor act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. [Citations.]" (*People v. Beeman* (1984) 35 Cal.3d 547, 560.) Thus, as the California Supreme Court has explained, "'Aider and abettor liability is premised on the combined acts of all the principals, but on the aider and abettor's own mens rea.' [Citation.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 116.) "[T]he the required mental states and acts for aiding and abetting [are]: '(a) the direct perpetrator's actus reus — a crime committed by

---

**11** Jurors were also presented with murder liability under the natural and probable consequences doctrine (see, e.g., *People v. Prettyman* (1996) 14 Cal.4th 248, 259-260), but the prosecutor made clear such a theory of liability would result in *second* degree murder, while a killing in the course of a robbery would constitute *first* degree murder. "'In California, the first degree felony-murder rule "is a creature of statute." [Citation.] When the prosecution establishes that a defendant killed while committing one of the felonies section 189 lists [including robbery], "by operation of the statute the killing is deemed to be first degree murder as a matter of law."' [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1175.)

the direct perpetrator, (b) the aider and abettor's mens rea — knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus — conduct by the aider and abettor that in fact assists the achievement of the crime.' [Citation.]" (*Id*. at pp. 116-117.)

"Under the felony-murder rule, an accomplice is liable for killings occurring while the killer was acting in furtherance of a criminal purpose common to himself and the accomplice, or while the killer and the accomplice were jointly engaged in the felonious enterprise. [Citation.] In order to support defendant's conviction as an aider and abettor, therefore, the record must contain substantial evidence that (a) [Patterson] committed the robbery (the perpetrator's actus reus), (b) defendant knew [Patterson's] intent to rob and intended to assist in the robbery (the aider and abettor's mens rea), and (c) defendant engaged in acts that assisted the robbery (the aider and abettor's actus reus)." (*People v. Thompson*, *supra*, 49 Cal.4th at p. 117.)

Viewing the evidence in accord with the applicable legal principles, set out *ante*, we conclude sufficient evidence exists to uphold both the robbery and first degree murder convictions. First, the evidence was overwhelming (indeed, undisputed) that Patterson took Guadalupe's gold chain by force and thereby committed robbery.

Second, jurors reasonably could have found defendant knew Patterson's intent to rob and intended to assist in the robbery. Evidence supporting such an inference included defendant's comradery with Patterson and McDonald on the days in question and prior thereto; defendant's presence during the uncharged robbery of Patrice Oliver[12]; the

---

[12]     Jurors were instructed that the uncharged robbery could be considered "for the limited purpose of deciding whether or not the defendant was the person who committed the offenses alleged in this case, or the defendant acted with the intent to commit robbery in this case, or the defendant knew the intent of Christopher Patterson with respect to the Ramos robbery when he allegedly acted in this case, or that the defendant had a plan or scheme to commit the offenses alleged in this case." Defendant now says some of these purposes were unsupported by the evidence or otherwise incorrect. To the extent he is suggesting the evidence was wrongly admitted or the jury was misinstructed as to its

15.

evidence that, after each robbery, defendant was at or near a location at which gold quickly could be sold for cash with no questions asked; and defendant's own statement, on another occasion, that members of the East Side Crips share money among themselves. We recognize that mere presence at the scene of a crime, failure to take action to prevent a crime, or knowledge of another's criminal purpose are not enough to establish aiding and abetting. (*People v. Stallworth* (2008) 164 Cal.App.4th 1079, 1103; *People v. Culuko* (2000) 78 Cal.App.4th 307, 331; *People v. Nguyen* (1993) 21 Cal.App.4th 518, 529-530.) They are, however, among the factors used in determining aiding and abetting, as are companionship and conduct before and after the crime. (*People v. Haynes* (1998) 61 Cal.App.4th 1282, 1294.)

Third, there was evidence from which a rational juror could have concluded defendant engaged in acts that assisted the robbery. Defendant was inside the Foods Co, in the immediate company of his fellow gang members, Patterson and McDonald, at a time when Guadalupe was also present and was wearing her gold chain. It would have been very difficult for the three to exit the store without seeing her and the necklace.[13] Defendant's GPS tracks showed him at the apartment complex a few minutes later, where McDonald replaced the overheating Buick he normally drove with Robinson's Camry. Defendant then returned to the Foods Co parking lot, where he remained at the time of the robbery, and shortly after, he was at Height and Gurley. Jurors reasonably could have concluded the trio scoped out the Foods Co patrons for a likely victim, returned to the apartment complex to obtain a getaway vehicle that was not likely to strand them in the midst of their flight, and then went back to Foods Co to carry out their plan. Thus, jurors

proper use, such factors do not affect our determination whether the convictions are supported by substantial evidence. (See *People v. Story* (2009) 45 Cal.4th 1282, 1296-1297; *In re Z.A.* (2012) 207 Cal.App.4th 1401, 1426.)

[13]    From the photograph of Guadalupe that was admitted into evidence and that showed her wearing the chain, jurors reasonably could have concluded the jewelry was in plain view of anyone who saw her.

could have concluded defendant engaged in acts of planning that assisted the robbery. They also could have concluded that by his presence, he was prepared to come to Patterson's aid should the need arise. (See *In re Gary F.* (2014) 226 Cal.App.4th 1076, 1081.)

Defendant suggests the foregoing is all speculation, conjecture, and surmise, none of which is sufficient to support a conviction. (See *People v. Marshall* (1997) 15 Cal.4th 1, 25.) To the contrary, we conclude such inferences are reasonably based on the evidence, and so are indeed sufficient to sustain the jury's conclusion defendant aided and abetted the robbery of Guadalupe and, as a result, was liable for her first degree murder under the felony-murder rule.[14]

## B.    The Robbery-Murder Special Circumstance

Defendant contends the evidence failed to establish he was a major participant who acted with reckless indifference to human life, as required for count 1's robbery-murder special circumstance. We find the evidence does not show defendant acted with reckless indifference to human life.

"'All murder … which is committed in the perpetration of, or attempt to perpetrate [robbery and other enumerated felonies] … is murder of the first degree [under section 189].' [Citation.] The mental state required is simply the specific intent to commit the underlying felony [citation], since only those felonies that are inherently dangerous to life or pose a significant prospect of violence are enumerated in the statute. [Citations.] 'Once a person has embarked upon a course of conduct for one of the enumerated felonious purposes, he comes directly within a clear legislative warning — if a death results from his commission of that felony it will be first degree murder, regardless of the circumstances.' [Citation.]" (*People v. Cavitt* (2004) 33 Cal.4th 187, 197.) Thus, "[t]he

---

**14**    We find the evidence quantitatively and qualitatively superior to that found to exist in *People v. Braun* (1939) 31 Cal.App.2d 593, 601-602, on which defendant relies.

purpose of the felony-murder rule is to deter those who commit the enumerated felonies from killing by holding them strictly responsible for any killing committed by a cofelon, whether intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony. [Citation.]" (*Ibid*.)

The mere fact a felony enumerated in section 189 was committed and death resulted is, however, insufficient by itself to establish a robbery-murder special circumstance with respect to a person who aided and abetted but was not the actual killer. Rather, the nonkiller must aid and abet the commission of murder in the first degree with the intent to kill (§ 190.2, subd. (c)), or, lacking intent to kill, must aid and abet the commission of a felony such as robbery "with reckless indifference to human life and as a major participant …." (*Id*., subd. (d).)[15]

Section 190.2, subdivision (d) was enacted to bring state law into conformity with prevailing Eighth Amendment doctrine, as set out in the United States Supreme Court's

---

[15] Subdivisions (c) and (d) of section 190.2 read, in their entirety: "(c) Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true under Section 190.4. [¶] (d) Notwithstanding subdivision (c), every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4."

Subdivision (a)(17)(A) of section 190.2 provides for a penalty of death or life in prison without the possibility of parole for a defendant found guilty of first degree murder committed "while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit," inter alia, robbery.

18.

decision in *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*).  (*People v. Estrada* (1995) 11 Cal.4th 568, 575 (*Estrada*); *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 298 & fn. 16.) In *Tison*, two brothers aided an escape by bringing guns into a prison and arming two murderers, one of whom they knew had killed in the course of a previous escape attempt. After the breakout, one of the brothers flagged down a passing car, and both fully participated in kidnapping and robbing the vehicle's occupants.  Both then stood by and watched as those people were killed.  The brothers made no attempt to help the victims before, during, or after the shooting, but instead chose to assist the killers in their continuing criminal endeavors.  (*Tison*, *supra*, 481 U.S. at pp. 151-152.)  The Supreme Court held the brothers could be sentenced to death despite the fact they had not actually committed the killings themselves or intended to kill, stating:  "[R]eckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.  [¶]  The [brothers'] own personal involvement in the crimes was not minor, but rather, … 'substantial.'  Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery, each … was actively involved in every element of the kidnap[p]ing-robbery and was physically present during the entire sequence of criminal activity culminating in the murder[s] … and the subsequent flight.  The Tisons' high level of participation in these crimes … implicates them in the resulting deaths."  (*Id.* at pp. 157-158.)

The *Tison* court pointed to the defendant in *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) as an example of a nonkiller convicted of murder under the felony-murder rule for whom the death penalty was unconstitutionally disproportionate.  Enmund was the driver of the getaway car in an armed robbery of a dwelling whose occupants were killed by Enmund's accomplices when they resisted.  (*Id*. at pp. 783-784; see *Tison*, *supra*, 481 U.S. at p. 146.)  In deciding the Eighth Amendment to the United States

Constitution forbid imposition of the death penalty "on one such as Enmund who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed" (*Enmund*, *supra*, at p. 797), the high court emphasized that the focus had to be on the culpability of Enmund himself, and not on those who committed the robbery and shot the victims. (*Id*. at p. 798.) "Enmund himself did not kill or attempt to kill; and, … the record … does not warrant a finding that Enmund had any intention of participating in or facilitating a murder.… [T]hus his culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to Enmund the culpability of those who killed the [victims]. This was impermissible under the Eighth Amendment." (*Ibid*.)

In *Tison*, the United States Supreme Court acknowledged that the Tison brothers likewise did not intend to kill, and so they did not "fall within the 'intent to kill' category of felony murderers for which *Enmund*" found the death penalty permissible. (*Tison*, *supra*, 481 U.S. at p. 151.) The court found it "equally clear," however, that the pair also fell outside the category of felony murderers for whom *Enmund* found the death penalty disproportional (*Tison*, *supra*, at p. 151): The facts shown by the record "not only indicate[d] that the Tison brothers' participation in the crime was anything but minor; they also … clearly support[ed] a finding that they both subjectively appreciated that their acts were likely to result in the taking of innocent life." (*Id*. at p. 152.)

In the present case, the parties agree there is no evidence defendant harbored an intent to kill. Accordingly, as the trial court instructed, the jury could only find the special circumstance allegation true by finding defendant was a major participant in the crime and acted with reckless indifference to human life.

20.

Defendant likens his case to *Enmund*, and points out he was not even the getaway driver.[16]  Although defendant does not cite us to any cases on the subject other than *Enmund* and *Tison*, we note he was sitting some distance away from the site of the robbery, did not provide Patterson with a weapon or (insofar as the evidence shows) possess one himself, and did not personally participate in the taking of Guadalupe's chain or the application of force or fear.  Thus, the facts of this case stand in contrast to those of *Tison* and a number of other cases in which the reviewing court upheld a determination the defendant was a major participant.  (See, e.g., *People v. Smith* (2005) 135 Cal.App.4th 914, 928 [defendant was one of only three perpetrators, served as only lookout to attempted robbery occurring in occupied motel complex, and stood sentry outside victim's room, where jury could infer he monitored and guarded increasingly loud and violent attempted-robbery-turned-murder], overruled on another ground in *People v. Garcia* (2008) 168 Cal.App.4th 261, 291; *People v. Hodgson* (2003) 111 Cal.App.4th 566, 579-580 [defendant was one of only two individuals involved, making his role more notable, conspicuous, and essential than if shooter had been assisted by coterie of confederates; defendant used his body to slow closing automatic garage gate, and so was instrumental in assisting killer to escape with proceeds from robbery]; *People v. Proby* (1998) 60 Cal.App.4th 922, 929 [defendant and actual killer were both armed and actively participated in robbery; defendant provided actual killer with gun used to kill victim]; *People v. Mora* (1995) 39 Cal.App.4th 607, 617 [defendant helped plan robbery and was instrumental in arranging for actual killer to enter victim's home with rifle].)

In terms of the phrase "major participant," "[t]he common meaning of 'major' includes 'notable or conspicuous in effect or scope' and 'one of the larger or more

---

**16**    Here, of course, defendant was sentenced to life in prison without the possibility of parole, not death as in *Enmund* and *Tison*.  The issue before us is sufficiency of the evidence to meet statutory criteria, not proportionality of the sentence under the Eighth Amendment.

21.

important members or units of a kind or group.' [Citation.]" (*People v. Proby*, *supra*, 60 Cal.App.4th at pp. 933-934.) Here, there was evidence from which jurors could have found defendant helped plan the robbery. We need not determine whether this is sufficient to sustain a finding defendant was a major participant, because the evidence must also show he acted with reckless indifference to human life. It does not.[17]

In *Estrada*, the California Supreme Court read *Tison* to "instruct[] that the culpable mental state of 'reckless indifference to life' is one in which the defendant 'knowingly engag[es] in criminal activities known to carry a grave risk of death' [citation]," and so "ascribe[d that meaning] to the statutory phrase" in subdivision (d) of section 190.2. (*Estrada*, *supra*, 11 Cal.4th at p. 577.) The court concluded the phrase "is commonly understood to mean that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death. The common meaning of the term 'indifference,' referring to 'the state of being indifferent,' is that which is 'regarded as being of no significant importance or value.' [Citation.] To *regard* something, even to regard it as worthless, is to be aware of it. [Citation.]" (*Ibid.*) Thus, "the generally accepted meaning of the phrase, 'reckless indifference to human life,' in common parlance amply conveys to the jury the requirement of a defendant's subjective awareness

---

**17** In *Tison*, *supra*, 481 U.S. at page 158, footnote 12, the United States Supreme Court stated: "Although we state these two requirements separately, they often overlap. For example, we do not doubt that there are some felonies as to which one could properly conclude that any major participant necessarily exhibits reckless indifference to the value of human life. Moreover, even in cases where the fact that the defendant was a major participant in a felony did not suffice to establish reckless indifference, that fact would still often provide significant support for such a finding." Under the circumstances of this case, we do not believe the fact defendant arguably was a major participant lends support for a finding he acted with reckless indifference.

The Attorney General relies heavily on the gang expert's testimony and opinions, and on the day-before robbery of Oliver. We fail to see how jurors reasonably could have inferred from such evidence — particularly that presented by the gang expert — that defendant acted with reckless indifference to human life, in the robbery of Guadalupe.

22.

of the grave risk to human life created by his or her participation in the underlying felony. This is the meaning intended by the phrase 'reckless indifference to human life' as it is used in section 190.2[, subdivision ](d), and as defined in *Tison*." (*Id*. at p. 578.)[18]

Considering the record in accordance with the standard principles of appellate review as set out *ante*, we find no evidence defendant was subjectively aware his participation in a chain-snatch robbery created a grave risk to human life. (Cf. *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1115-1117 [jury could have found defendant acted with reckless indifference where she lured victim into secluded alley to be robbed, knowing her confederate had a gun, and, after hearing gunshot, failed to help victim or call 911]; *People v. Smith*, *supra*, 135 Cal.App.4th at p. 927 [same; even if defendant remained outside victim's room as lookout, jury could have found defendant gained subjective awareness of grave risk to human life during time it took victim to be stabbed and beaten and have head slammed through wall; in addition, when killer emerged covered in blood, defendant chose to flee rather than going to victim's aid or summoning help]; *People v. Hodgson*, *supra*, 111 Cal.App.4th at p. 580 [same; defendant had to be aware use of gun to effect robbery presented grave risk of death, yet, instead of coming to victim's aid after first shot, chose to assist killer in accomplishing robbery by trying to keep garage gate from closing until killer could escape from garage with loot]; *People v. Proby*, *supra*, 60 Cal.App.4th at p. 929 [same; defendant provided gun to cohort, who shot victim in back of head; defendant saw something oozing from victim's head but instead of attempting to assist him or determine if he was alive, joined killer in taking

---

18    Although the California Supreme Court determined in *Estrada* that trial courts have no sua sponte duty to explain the phrase "reckless indifference to human life" to the jury because the phrase "is commonly understood to mean that a defendant subjectively appreciated that his or her conduct created a grave risk to human life" (*Estrada*, *supra*, 11 Cal.4th at p. 581), the standard jury instruction — CALCRIM No. 703 — includes a definition of the phrase. Pursuant to that instruction, defendant's jury was told: "A person acts with reckless indifference to human life when he or she knowingly engages in criminal activity that he or she knows involves a grave risk of death."

money and fleeing; defendant and killer had previously participated in armed robbery the circumstances of which made defendant aware of killer's willingness to do violence although victims of earlier robbery were not killed]; *People v. Mora*, *supra*, 39 Cal.App.4th at p. 617 [same; defendant admitted planning to go to drug dealer's home at night to rob him by having confederate enter with rifle that fired three-inch bullets; although he did not know whether victim was still alive after being shot, defendant did not attempt to aid victim, but instead carried through with original plan to steal victim's drugs, personally carried away loot, left victim to die, and threatened remaining victim]; *People v. Bustos* (1994) 23 Cal.App.4th 1747, 1754 [same; pursuit to plan, defendant went into restroom at beach to rob victim, aware that cohort had knife and was outside, getting ready to run in; after defendant struggled with victim, who screamed, cohort entered and stabbed victim twice in torso; defendant did not attempt to prevent stabbing, but fled with accomplices and robbery loot, leaving victim to die].)

In the present case, there was no evidence any of the three participants was armed with a deadly weapon of any sort. The robbery took place in an unsecluded, public area, and was obviously meant to be a quick grab-and-go type of theft. Although jurors could have concluded defendant was present during the commission of a similar crime a day earlier and so knew force might be used, the force necessary to turn theft into robbery does not carry a grave risk of death. (See *People v. Burns*, *supra*, 172 Cal.App.4th at p. 1259 [defendant grabbed victim's purse; use of his strength and act of stepping on her foot to overcome her resistance constituted sufficient force for robbery].)

The Attorney General argues that forcibly throwing an elderly person to the asphalt of a parking lot, where her head could easily be injured, carries with it a grave risk of death. However, the focus is on *defendant's* subjective awareness of the grave risk created *by his or her participation* in the underlying felony. (*Estrada*, *supra*, 11 Cal.4th at p. 578; see *Tison*, *supra*, 481 U.S. at p. 152 [facts supported finding Tison brothers subjectively appreciated *their acts* were likely to result in taking of innocent

24.

life].) Here, defendant was present in the getaway car and probably participated as a coplanner. He did not supply a weapon or personally use force, nor did he have reason to believe death might be the result. It is true that after the forcible taking of Guadalupe's chain, defendant did not go to her aid. But we can only speculate whether he could see Guadalupe or realized she had been knocked to the ground, or, assuming he saw, had reason to believe she was injured or in need of assistance when other people were already helping her. "'[S]peculation is not evidence, less still substantial evidence.' [Citations.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 735.)[19]

The Attorney General points to the gang expert's testimony that for robberies, gang members want something easy to obtain, where they can complete the offense with minimal risk to themselves, and that a byproduct of this is injury to the victim. Injury is not synonymous with grave risk of death. The Attorney General also quotes the trial court's observation at sentencing, to the effect that any time a perpetrator engages in a violent course of criminal conduct, the perpetrator does so with the risk that the results may be much more catastrophic than expected, and that this is the risk assumed by

---

[19] The prosecutor argued, in the context of second degree murder, that a natural consequence of taking something off an elderly woman's person and throwing her to the ground was dangerous to human life and was committed with knowledge of the danger and disregard for human life. However, he did not offer jurors any theory of how the evidence met the requirements for a true finding on the special circumstance *for an aider and abettor*. Instead, he told them: "Mr. Slaughter sits here as an aider and abettor; the intended crime of robbery. The knowledge — he has to have the knowledge. He has to aid, facilitate, promote, encourage.… It will be up to you to decide if he did those items below: Aid, facilitate, promote, encourage or instigate. One of them or all of them. [¶] Felony murder. The defendant committed or aided and abetted a robbery. He intended to do so. If he did not personally commit the robbery, then the perpetrator whom he was with did commit the robbery leading to the death of Miss Ramos. [¶] Again, this special circumstance contains the same language. The robbery. The killing occurred during the robbery." Although jurors were instructed on what was required in order to find the special circumstance and were not limited to the prosecutor's theories or arguments, the prosecutor's remarks suggest he either was unaware of the applicable law or simply had no theory as to how anything more than felony murder itself was shown by the evidence.

25.

perpetrators when they commit violent crimes, including when committing them in concert with others. We agree; this is one reason for the existence of the felony-murder rule. We disagree, however, that engaging in a course of conduct that gives rise to results more catastrophic than expected necessarily means the perpetrator exhibited reckless indifference to human life. Were that the case, the robbery-murder special circumstance would automatically attach in virtually every case in which an aider and abettor was a major participant in a felony listed in section 189.

Because the evidence is insufficient to sustain the jury's true finding on count 1's special circumstance, we order that finding vacated. Retrial of the special circumstance allegation is barred. (*People v. Lewis* (2008) 43 Cal.4th 415, 509, disapproved on another ground in *People v. Black* (2014) 58 Cal.4th 912, 918-920; see *People v. Hatch* (2000) 22 Cal.4th 260, 271-272.)

## II

### JURY INSTRUCTIONS

Defendant raises three claims of purported instructional error.[20] We find merit in his claim the trial court erred by failing to instruct, as to first degree felony murder, that the jury had to find he aided and abetted the robbery before or at the time of the act(s) causing death. We agree with defendant that under the instructions given, the jury could have believed he was guilty of felony murder because he aided and abetted a robbery in progress when he participated in asportation of the loot and in the sharing of the proceeds, even though the act that caused Guadalupe's death preceded his participation. Because we find the error requires reversal of defendant's murder conviction, we do not reach defendant's other two claims of error.[21]

---

[20] The Attorney General does not contend any have been forfeited.

[21] Defendant takes issue with the trial court's instructions on implied malice murder and murder as a natural and probable consequence of robbery or grand theft. It is true these instructions did not distinguish between degrees of murder. However, the

26.

## 1.    Background

The prosecution presented evidence from which the jury reasonably could have determined defendant was a coplanner of the robbery and participated in casing the Foods Co for a victim — in other words, that he aided and abetted the robbery from the outset. This evidence was not overwhelming, however, and jurors reasonably could have accepted defendant's position that he was merely present, and in the company of Patterson and McDonald, before Guadalupe was robbed.[22]

prosecutor's argument made clear that conviction on this theory would result in second degree murder, while conviction on a theory of felony murder would be first degree murder. The trial court's instructions also referenced felony murder as being first degree. The jury's verdicts fixed the degree of murder as murder in the first degree, and included an express finding the crime was done during the commission or attempted commission of robbery, within the meaning of section 189. Thus, if there was error in the pertinent instructions, it can be corrected upon retrial of count 1.

Defendant also alleges problems with the trial court's modification of CALCRIM No. 1600 to include accomplice liability principles. As given in this case, the instruction told jurors, in pertinent part: "The defendant is charged in Count 2 with robbery. To prove that the defendant is guilty of this crime, the People must prove that: One, the defendant *or the perpetrator* took property that was not his own; two, the property was taken from another person's possession and immediate presence; three, the property was taken against that person's will; four, the defendant *or the perpetrator* used force or fear to take the property or to prevent the person from resisting; and five, when the defendant *or the perpetrator* used force or fear to take the property, he intended to deprive the owner of it permanently. [¶] The defendant's *or the perpetrator's* intent to take the property must have been formed before or during the time he used force or fear. If the defendant or the perpetrator did not form this required intent until after using the force or fear, then he did not commit robbery." (Italics added.) We agree the instruction was unnecessarily confusing and, depending on what jurors found to be the facts, did not necessarily correctly state the law. We do not read defendant's brief as claiming prejudicial error with respect to the *robbery* conviction itself, but only as to the murder conviction. Again, any errors can be corrected upon retrial.

[22]    Jurors reasonably could have discounted the prosecutor's claim defendant was present at FoodMaxx when Oliver was robbed; she told Stratton the incident took place between about 3:10 and 4:00 p.m., at a time when GPS tracks placed defendant in the store parking lot, but she insisted at trial that she was robbed at 2:45 p.m. Moreover, neither the GPS tracks nor any eyewitness placed defendant at the immediate scene of either robbery; rather, at most he was merely placed in the vicinity by his GPS

27.

Without objection or modification, the trial court gave CALCRIM No. 1603 in conjunction with instructions on robbery, as charged in count 2. That instruction told jurors:

> "To be guilty of robbery as an aider and abettor, the defendant must have formed the intent to aid and abet the commission of the robbery before or while a perpetrator carried away the property to a place of temporary safety.

> "A perpetrator has reached a place of temporary safety with the property if he or she has successfully escaped from the scene, is no longer being pursued and has unchallenged possession of the property."

During the instruction conference, the prosecutor requested that references to conspiracy be deleted from the instruction on first degree felony murder. The trial court made the requested modifications, then, without objection, gave CALCRIM No. 540B as follows:

> "The defendant is charged in Count 1 with murder under a theory of felony murder. The defendant may be guilty of murder under a theory of felony murder even if another person did the act that resulted in the death.

> "I will call the other person the perpetrator.

> "To prove that the defendant is guilty of first-degree murder under this theory, the People must prove that: One, the defendant aided and abetted robbery; two, the defendant intended to aid and abet the perpetrator in committing robbery; three, if the defendant did not personally commit robbery, then a perpetrator whom the defendant was aiding and abetting personally committed robbery; four, while committing robbery, the perpetrator caused the death of another person; and five, there was a logical connection between the cause of death and the robbery.

> "The connection between the cause of death and the robbery must involve more than just their occurrence at the same time and place.

tracks. Jurors reasonably could have concluded he wanted no part of snatching some woman's necklace, but was willing to help a fellow gang member escape, should that person commit a crime, and to partake in the proceeds.

28.

"A person may be guilty of felony murder even if the killing was unintentional, accidental or negligent.

"To decide whether the perpetrator committed robbery, please refer to the separate instructions that I will give you on that crime. To decide whether the defendant aided and abetted a crime, please refer to the separate instructions that I have given you on aiding and abetting. You must apply those instructions when you decide whether the People have proved first-degree murder under a theory of felony murder.

"It is not required that the person die immediately, as long as the cause of death and the felony are part of one continuous transaction. It is not required that the defendant be present when the death occurs."

For reasons not apparent from the jury instruction conference, the trial court omitted a bracketed paragraph from the instruction that would have told jurors: "[The defendant must have (intended to commit[,]/ [or] aid and abet[,]/ [or] been a member of a conspiracy to commit) the (felony/felonies) of ___ <insert felony or felonies from Pen. Code, § 189> before or at the time that (he/she) caused the death.]"

With respect to the robbery-murder special circumstance, and without objection, the trial court gave CALCRIM No. 703, which told the jury, in pertinent part:

"If you decide that the defendant is guilty of first-degree murder but was not the actual killer, then when you consider the special circumstance of whether the murder was committed by the defendant while engaged in the commission of or acting as an accomplice to the crime of robbery, you must also decide whether the defendant acted either with intent to kill or with reckless indifference to human life.

"In order to prove this special circumstance for a defendant who is not the actual killer but who is guilty of first-degree murder as an aider and abettor, the People must prove either that the defendant intended to kill or the People must prove all of the following: One, the defendant's participation in the crime began before or during the killing; two, the defendant was a major participant in the crime; and three, when the defendant participated in the crime, he acted with reckless indifference to human life."

Finally, and again without objection, the trial court instructed the jury with CALCRIM No. 730, to wit:

29.

"The defendant is charged with a special circumstance of murder committed while engaged in the commission of robbery. To prove that this special circumstance is true, the People must prove that: One, the defendant aided and abetted a robbery; two, the defendant intended to aid and abet the perpetrator in committing a robbery; three, if the defendant did not personally commit robbery, then a perpetrator whom the defendant was aiding and abetting before or during the killing personally committed a robbery; four, the perpetrator did an act that caused the death of another person; five, the act causing the death and the robbery were part of one continuous transaction; and six, there was a logical connection between the act causing the death and the robbery. The connection between the fatal act and the robbery must involve more than just their occurrence at the same time and place.

"To decide whether the perpetrator committed robbery, please refer to the separate instruction that I gave you on that crime. To decide whether the defendant aided and abetted a crime, please refer to the separate instructions that I have given you on aiding and abetting. You must apply those instructions when you decide whether the People have proved first-degree murder under a theory of felony murder."

The final sentence quoted above was contained in both the court's oral and written instructions, a copy of which was given to the jury. The sentence should have read: "You must apply those instructions when you decide whether the People have proved *this special circumstance*." (Italics added.) Again, the trial court omitted the portion of the instruction that would have told jurors: "[The defendant must have (intended to commit[,]/ [or] aided and abetted/ [or] been a member of a conspiracy to commit) the (felony/felonies) of ___ *insert felony or felonies from Pen. Code, § 190.2(a)(17)>* before or at the time of the act causing the death.]"

2. Analysis

""""[T]he crime of robbery is not confined to the act of taking property from victims. The nature of the crime is such that a robber's escape with his loot is just as important to the execution of the crime as obtaining possession of the loot in the first place."' [Citation.] As a result, the commission of a robbery is ongoing '"until the robber has won his way to a place of temporary safety."' [Citation.] A robber has not

reached a place of temporary safety while an immediate and active pursuit to recover the property is in progress. [Citation.]" (*People v. Debose* (2014) 59 Cal.4th 177, 205.) Because of this, for aider and abettor liability where *robbery* is concerned, "a getaway driver [or other aider and abettor] must form the intent to facilitate or encourage commission of the robbery prior to or during the carrying away of the loot to a place of temporary safety." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1165, fn. & italics omitted; see *id*. at pp. 1169-1170.) As given here, CALCRIM No. 1603 correctly conveyed these legal principles with respect to count 2, the robbery charge.

Where the complicity of an aider and abettor in *felony murder* is concerned, however, different legal principles apply. In *People v. Pulido* (1997) 15 Cal.4th 713 (*Pulido*), the California Supreme Court "address[ed] a question regarding the scope of complicity in robbery murder. If one person, acting alone, kills in the perpetration of a robbery, and another person *thereafter* aids and abets the robber in the asportation and securing of the property taken, is the second person guilty of first degree murder under section 189? … [T]he answer is no. Although the second person is an accomplice to robbery [citation], such participation in the robbery does not subject the accomplice to murder liability under section 189, because the killer and accomplice were not 'jointly engaged at the time of such killing' in a robbery [citation]; the killer, in other words, was not acting, at the time of the killing, in furtherance of a 'common' design to rob [citation]." (*Id*. at p. 716.)[23]

In *Pulido*, the victim was shot in the head and died within seconds. (*Pulido*, *supra*, 15 Cal.4th at p. 717.) The court thus had no occasion to clarify the situation

---

[23]    "It is settled that if a defendant's liability for an offense is predicated upon the theory that he or she aided and abetted the perpetrator, the defendant's intent to encourage or facilitate the actions of the perpetrator 'must be formed *prior to or during* "commission" of that offense.' [Citations.]" (*People v. Montoya* (1994) 7 Cal.4th 1027, 1039.) Defendant's jury was so instructed.

present here, in which the act or acts causing death are separated by a significant period of time from the death itself.[24]  Other opinions make clear, however, that what matters for purposes of felony-murder liability has always been the time of commission of the acts that resulted in the victim's death, even if death did not immediately result.  (See, e.g., *People v. Cavitt*, *supra*, 33 Cal.4th at p. 196; *People v. Lewis* (2001) 25 Cal.4th 610, 647; *People v. Alvarez* (1996) 14 Cal.4th 155, 222; *People v. Ainsworth* (1988) 45 Cal.3d 984, 1016; *People v. Celis* (2006) 141 Cal.App.4th 466, 473; *People v. Esquivel* (1994) 28 Cal.App.4th 1386, 1396.)

In the present case, there was evidence from which a rational jury could find defendant guilty of robbery and first degree felony murder.  However, the evidence also was reasonably susceptible of a conclusion defendant was, at most, guilty of robbery.  In light of the foregoing, the omitted paragraph of CALCRIM No. 540B, quoted *ante*, was a correct statement of the law and was factually applicable to the present case.  Although the record does not show defendant objected to its omission, we believe the trial court should have included it on its own motion, with a slight modification so that the final clause referred to the time the perpetrator (rather than the defendant) caused the death.

"A trial court has a sua sponte duty to instruct on the general principles of law relevant to the issues raised by the evidence.  [Citation.]"  (*People v. Marks* (1988) 45 Cal.3d 1335, 1345.)  One of the Bench Notes following CALCRIM No. 540B advises that if there is evidence the defendant did not form the intent to commit the felony, or did not aid and abet the felony, until after the homicide, he or she is entitled *on request* to an instruction pinpointing the issue, and in such instances, the bracketed paragraph quoted

---

**24**　　The *Pulido* court referred variously to complicity in a felony murder not extending to "one who joins the felonious enterprise after the killing has been completed" (*Pulido*, *supra*, 15 Cal.4th at p. 722), the requirement that the accomplice be a conspirator or aider and abettor in the felony "at the time of the killing" (*id*. at p. 723), and its refusal to extend the first degree felony-murder rule to include aiders and abettors who joined the felonious enterprise "only after the murder has been completed" (*id*. at p. 726).

*ante* should be given. Such notes do not have the force of law, however. (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1381.) Moreover, in each of the cases cited as authority (*People v. Silva* (2001) 25 Cal.4th 345, 371; *People v. Hudson* (1955) 45 Cal.2d 121, 124-127; see *People v. Turner* (1990) 50 Cal.3d 668, 691), the defendant was the actual killer. Because the general instructions given by the court in defendant's case did not inform the jury that defendant had to have aided and abetted the robbery before the acts that resulted in Guadalupe's death in order to be found guilty of felony murder, the court had a sua sponte duty to instruct the jury on the timing of defendant's intent. (*People v. Esquivel*, *supra*, 28 Cal.App.4th at p. 1399; see *People v. Riccardi* (2012) 54 Cal.4th 758, 837-838; *People v. D'Arcy* (2010) 48 Cal.4th 257, 296-297; *People v. Marks*, *supra*, 45 Cal.3d at p. 1345; *People v. Anderson* (2006) 141 Cal.App.4th 430, 446-447.)[25]

Jurors were directed to consider the instructions together. As jurors are presumed to follow the instructions given by the court (*People v. Murtishaw* (1989) 48 Cal.3d 1001, 1044), we presume they did so. Accordingly, we must assess the effect of the giving of CALCRIM No. 1603, which described the timing of an aider and abettor's formation of intent vis-à-vis robbery, with the truncated version of CALCRIM No. 540B, which omitted a description of the timing of an aider and abettor's formation of intent vis-à-vis felony murder. "In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled. [Citations.]" (*People v. Tate* (2010) 49 Cal.4th 635, 696; see *Estelle v. McGuire* (1991) 502 U.S. 62, 72-73 & fn. 4; *Boyde v. California* (1990) 494 U.S. 370, 380.) We also consider the arguments of counsel in assessing the probable impact of the instruction

---

[25]    Significantly, the Attorney General does not argue the evidence only supported a finding of preforce aiding and abetting, but rather says the factual question posed by the alleged error was necessarily resolved adversely to defendant under other, properly given instructions. This claim goes to the question of prejudice, not error in the first instance.

or instructions on the jury. (*People v. Young*, *supra*, 34 Cal.4th at p. 1202; see *Weeks v. Angelone* (2000) 528 U.S. 225, 236.) We independently determine whether instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

Taken together, CALCRIM Nos. 540B and 1603, as given in this case, permitted defendant to be found guilty of felony murder even if he did not aid and abet the robbery until after commission of the act that caused Guadalupe's death. This was error.

Instructional error affecting an element of the charged offense warrants reversal unless it is harmless beyond a reasonable doubt. (*People v. Cooper*, *supra*, 53 Cal.3d at p. 1171; see *People v. Wilkins* (2013) 56 Cal.4th 333, 348-350; *People v. Chavez* (2004) 118 Cal.App.4th 379, 387.) Likewise, when the jury is given the option of relying on two theories of guilt, one of which is legally correct but the other of which is legally incorrect, reversal is required unless the record demonstrates, beyond a reasonable doubt, that the verdict was actually based on a valid ground. (*People v. Chun* (2009) 45 Cal.4th 1172, 1203; *People v. Guiton* (1993) 4 Cal.4th 1116, 1129; *People v. Green* (1980) 27 Cal.3d 1, 69, overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 239 & *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3; see *Hedgpeth v. Pulido* (2008) 555 U.S. 57, 58; *Chapman v. California* (1967) 386 U.S. 18, 24.)[26] In making this determination, we must consider what effect the error had upon the guilty verdict *in this case*, and so we must look "to the basis on which 'the jury *actually rested* its verdict.' [Citation.] The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279; see *People v. Esquivel*, *supra*, 28 Cal.App.4th at pp. 1399-1400.) As the California Supreme Court has explained, "*Neder* [*v. United States* (1999) 517 U.S. 1, 19]

---

[26] A legally incorrect theory is one "which, if relied upon by the jury, could not *as a matter of law* validly support a conviction of the charged offense." (*People v. Harris* (1994) 9 Cal.4th 407, 419, fn. omitted.)

34.

instructs us to 'conduct a thorough examination of the record. If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error … it should not find the error harmless.' [Citation.]" (*People v. Mil* (2012) 53 Cal.4th 400, 417.)

Error of the type present here may be found harmless where the jury resolved the issue against the defendant in another context, pursuant to other, properly given instructions. (See, e.g., *People v. Sakarias* (2000) 22 Cal.4th 596, 625; *People v. Hayes* (1990) 52 Cal.3d 577, 628; *People v. Sanders* (1990) 51 Cal.3d 471, 509-510.) The Attorney General urges us to use this means to find the error harmless in the present case. She says that, taken together, the instructions on aiding and abetting, felony murder, and the special circumstance, along with the jury's special circumstance finding, show the jury necessarily found defendant "had *pre-force joinder*"; hence, "the verdicts rendered were 'surely unattributable' to any errors" and so were harmless beyond a reasonable doubt. We disagree.

Pursuant to CALCRIM No. 401, jurors were instructed that "[t]o prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: One, the perpetrator committed the crime; two, the defendant knew that the perpetrator intended to commit the crime; three, *before or during the commission of the crime the defendant intended to aid and abet the perpetrator in committing the crime*; and four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime." (Italics added.) Since there was no evidence anyone intended to commit the crime of murder, the crime referred to in the instruction can only be robbery or grand theft. Yet CALCRIM No. 1603 permitted jurors to find defendant aided and abetted robbery even if he did not form the intent to aid and abet until the asportation phase of the crime. CALCRIM No. 540B, the instruction on first degree felony murder, merely required jurors to find defendant aided and abetted robbery, and that "[w]hile committing" robbery, the perpetrator caused the death of another person. Although the

35.

instruction went on to state, "It is not required that the person die immediately, as long as the cause of death and the felony are part of one continuous transaction," and "[i]t is not required that the defendant be present when the death occurs," nothing in its language — particularly when considered with CALCRIM Nos. 401 and 1603 — required jurors to find defendant was aiding and abetting at the time of the act causing death.

The special circumstance instructions similarly do not allow us to say the jury necessarily resolved the issue adversely to defendant.[27] CALCRIM No. 703 required the People to prove, inter alia, that "the defendant's participation in the crime began before or during *the killing*." (Italics added.) CALCRIM No. 730 required the People to prove, inter alia, that "if the defendant did not personally commit robbery, then a perpetrator whom the defendant was aiding and abetting before or during *the killing* personally committed a robbery; … the perpetrator did an act that caused the death of another person; [and] the act causing the death and the robbery were part of one continuous transaction." (Italics added.)

Jurors were told that words and phrases not specifically defined in the instructions were to be applied "using their ordinary, everyday meanings." The ordinary definition of "kill" is "to deprive of life : put to death : cause the death of." (Webster's 3d New Internat. Dict. (1986) p. 1242.) The common definition of "killing" includes "the act of one that kills; *esp* : MURDER, HOMICIDE" and "having the effect of killing : as … producing death." (*Ibid*.)

In light of the variance among the everyday meanings of "killing," it is reasonably likely one or more jurors interpreted the instructions as saying defendant's participation/aiding and abetting had to precede *Guadalupe's death itself*, and not merely

---

**27** We express no opinion concerning whether a jury's special circumstance finding that is not supported by substantial evidence amounts to a proper resolution of an issue for purposes of assessing prejudice from instructional error.

the act that caused her death.**28**  Inclusion of the bracketed portion of CALCRIM No. 730 that informed jurors defendant must have aided and abetted before or at the time of the *act causing death* would have cured the problem, because it would have clarified that the critical moment for felony-murder complicity was commission of the act causing death, and not death itself.  Without that clarification, however, it cannot be determined beyond a reasonable doubt that the giving of CALCRIM No. 1603 in its unmodified form, together with omission of the bracketed language from CALCRIM No. 540B, did not contribute to defendant's conviction of first degree murder.  (See *People v. Swain* (1996) 12 Cal.4th 593, 607.)  Nor can we "be certain beyond a reasonable doubt that the jury would have found defendant guilty of [first degree] murder had it been properly instructed." (*People v. Banks* (2014) 59 Cal.4th 1113, 1153, disapproved on another ground in *People v. Scott* (2015) ___ Cal.4th ___, ___, fn. 3 [2015 Cal. Lexis 3903, *45, fn. 3].)  While there was sufficient evidence to support a finding defendant aided and abetted before or during commission of the act causing death, jurors reasonably could have found only postforce aiding and abetting.  (See *People v. Haley* (2004) 34 Cal.4th 283, 310.)  Stated another way, "the evidence and the inferences that may reasonably be drawn from the evidence … do not prove [defendant aided and abetted before or during the act that caused death] so overwhelmingly that the jury could not have had a reasonable doubt on the matter.  [Citations.]" (*People v. Marshall*, *supra*, 15 Cal.4th at p. 44; see *People v. Riccardi*, *supra*, 54 Cal.4th at p. 839; *People v. Chavez*, *supra*, 118 Cal.App.4th at p. 387 [for error to be harmless beyond a reasonable doubt, evidence must be of such compelling force as to show beyond a reasonable doubt that erroneous instruction must have made no difference in reaching verdict obtained].)

---

**28**     "[A] victim's death is a sine qua non of murder .…"  (*People v. Celis*, *supra*, 141 Cal.App.4th at p. 471.)  "[A] murder ends with the death of the victim." (*People v. Esquivel*, *supra*, 28 Cal.App.4th at p. 1397.)

The arguments of counsel did not lessen the prejudicial impact of the instructions. For instance, the prosecutor told the jury:

> "How do you aid and abet a crime?  You have to have knowledge of the intent of the perpetrator.…  That is Christopher Patterson, or Baby Rose, from the East Side Crips.  An aider and abettor, *before or during the commission of the crime — in this case robbery*.  The defendant — that will be Mr. Slaughter currently here in court — intended to aid and abet. [¶] … [¶]

> "The ways to be guilty of murder, again, you can be the person who directly commits the murder.  That would be Christopher Patterson.  You can be guilty as an aider and abettor.  *You're aiding and abetting a robbery, during the course of the robbery, somebody dies*, you know of the unlawful purpose of the perpetrator, *you are guilty of murder*."  (Italics added.)

After explaining the natural and probable consequences doctrine, the prosecutor stated:  "And then moving on, *aiding and abetting robbery, that is felony murder*, which is first-degree murder."  (Italics added.)  A short time later, the prosecutor told the jury:

> "Felony murder. *The defendant committed or aided and abetted a robbery*.  He intended to do so.  If he did not personally commit the robbery, then the perpetrator whom he was with did commit the robbery leading to the death of Miss Ramos.

> "Again, this special circumstance contains the same language. *The robbery.  The killing occurred during the robbery*."  (Italics added.)

The instructions, taken as a whole, did not correctly state the law with respect to first degree felony-murder complicity of an aider and abettor.  Neither attorney clarified the matter.  The conviction on count 1 must be reversed, although it is supported by substantial evidence and so can be retried.[29]

---

**29**    Reversal of the conviction necessitates reversal of the related section 186.22, subdivision (b) enhancement.  (See, e.g., *People v. Montes* (2014) 58 Cal.4th 809, 898; *People v. Petrilli* (2014) 226 Cal.App.4th 814, 828.)  Defendant makes no claim there is insufficient evidence to support the enhancement, and it can be retried along with the murder charge.  (See *People v. Zarazua* (2008) 162 Cal.App.4th 1348, 1359, fn. 18.)

## III

### DENIAL OF CONTINUANCE

Defendant contends the trial court abused its discretion by denying a defense request for a continuance to investigate and possibly prepare a new trial motion based upon new evidence. We conclude no cause for reversal has been shown.

### A. Background

The jury returned its verdicts on April 18, 2013, trial on the prior conviction allegations was held that same day, and sentencing was set for Monday, May 13, 2013.

At the time set for sentencing, defense counsel stated he believed there was legal cause why judgment should not be pronounced. He related that "during the middle" of the preceding week, he received an unsolicited letter from Patterson. Counsel stated he disclosed the receipt of that letter, although not its contents, to the prosecutor and Patterson's attorney "during the middle of last week." On Friday, counsel received a second letter from Patterson. Counsel represented that he had now disclosed the contents of both letters to the prosecution, but had not had an opportunity to disclose their contents to Patterson's attorney. Counsel inferred Patterson appeared willing to testify for defendant. Counsel requested a continuance of the sentencing hearing to find out if Patterson (who was still pending trial) wanted to testify in a trial involving defendant, even over the objection of Patterson's lawyer; if so, that might furnish grounds for a new trial based on newly discovered evidence. Counsel also wanted to find out if Patterson at least would be willing to testify at defendant's sentencing hearing; if so, counsel would need to subpoena him. Accordingly, counsel requested a continuance of approximately three to four weeks.

The trial court noted that if Patterson was going to testify that defendant did nothing but sit in the car, those facts were presented to defendant's jury. Defense counsel responded that he could not have direct communication with Patterson because Patterson was represented by counsel, but that in the letters, Patterson alluded to the fact defendant

39.

was innocent and had no knowledge of the crime Patterson was about to commit, and that Patterson acted on his own. The prosecutor noted Patterson had provided statements to the police, and that based on circumstantial evidence, any statements Patterson made in his letters concerning defendant's involvement should not be deemed credible. He further argued ample circumstantial evidence was presented to defendant's jury. After confirming defense counsel was requesting a continuance for the purposes of filing a motion for a new trial and for procuring Patterson's presence to testify at sentencing, the court asked if a one-day continuance would give defense counsel enough time to compel Patterson's presence to see if he was willing to testify. Defense counsel responded that he was supposed to file a motion for new trial within 10 court days in order to give the prosecution notice, and that he had not even been able to disclose the contents of the second letter to Patterson's attorney. The court stated it was thinking more in terms of obtaining Patterson's testimony at sentencing, but then denied both requests on the basis the offer of proof was insufficient.

The court permitted defense counsel to present the letters as exhibits. It reviewed and admitted them without objection. It then noted exhibit A1 was neither dated nor signed, while exhibit A2 bore a printed signature purporting to be that of Patterson. It stated: "If Mr. Patterson is the author of these documents, he does, in fact, admit that he has not been truthful in his previous statements, and I see nothing in here that indicates a specific representation that he will — or is willing to testify at the sentencing. [¶] So my ruling will remain the same. I will deny the defense motions and proceed with the sentencing."

**B.** **Analysis**

"Continuances shall be granted only upon a showing of good cause." (§ 1050, subd. (e).)[30] The same rules apply to motions to continue sentencing hearings as apply to motions to continue trial. (See, e.g., *People v. Snow* (2003) 30 Cal.4th 43, 70, 77.)

> "Whether good cause exists is a question for the trial court's discretion. [Citation.] The court must consider ""'not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion.'"" [Citation.] While a showing of good cause requires that both counsel and the defendant demonstrate they have prepared for trial with due diligence [citation], the trial court may not exercise its discretion 'so as to deprive the defendant or his attorney of a reasonable opportunity to prepare.' [Citation.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 450.)

"The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked. [Citation.]" (*People v. Beames* (2007) 40 Cal.4th 907, 920.) "A reviewing court considers the circumstances of each case and the reasons presented for the request

---

[30] Subdivision (b) of section 1050 requires all motions for continuance in criminal cases to be in writing and filed and served on all parties at least two court days before the hearing sought to be continued, together with affidavits or declarations setting out specific facts showing a continuance is necessary. If, as is permitted by subdivision (c) of the statute, a party makes a motion for a continuance without complying with those requirements, subdivision (d) of section 1050 requires the court to hold a hearing on whether there is good cause for the failure to comply. "At the conclusion of the hearing, the court shall make a finding whether good cause has been shown and, if it finds that there is good cause, shall state on the record the facts proved that justify its finding. A statement of the finding and a statement of facts proved shall be entered in the minutes. If the moving party is unable to show good cause for the failure to give notice, the motion for continuance shall not be granted." (*Ibid*.)

In the present case, we assume the trial court implicitly found good cause, in light of the fact defense counsel received the letters less than a week before the scheduled sentencing hearing, for counsel's failure to comply with the requirements of section 1050, subdivision (b). The trial court did not, however, comply with the requirements of subdivision (d) of the statute before proceeding to hear the continuance motion.

41.

to determine whether a trial court's denial of a continuance was so arbitrary as to deny due process. [Citation.] Absent a showing of an abuse of discretion and prejudice, the trial court's denial does not warrant reversal. [Citation.]" (*People v. Doolin*, *supra*, 45 Cal.4th at p. 450.)

We question whether the record shows diligence on the part of defense counsel. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 1037; *People v. Howard* (1992) 1 Cal.4th 1132, 1171; but see *People v. Martinez* (1984) 36 Cal.3d 816, 824.) Nothing suggests he could not simply have telephoned Patterson's attorney, whose identity he knew, advised him of the receipt and content of the letters, and at least begun the process of determining whether they were even written by Patterson and, if so, whether he would be willing to testify.[31]

Even assuming defense counsel acted as diligently as possible, defendant has failed to show the trial court abused its discretion. "In reviewing the decision to deny a continuance, '[o]ne factor to consider is whether a continuance would be useful. [Citation.]' [Citation.]" (*People v. Mungia* (2008) 44 Cal.4th 1101, 1118.) Assuming one or both of the letters was written by Patterson (or at his behest) and he was willing to testify defendant was not involved in, and had no knowledge of, the incident involving Guadalupe, defendant would have been entitled to a new trial based on newly discovered evidence if that evidence (i.e., Patterson's testimony) would render a different result probable if a new trial were held. (*People v. Soojian* (2010) 190 Cal.App.4th 491, 519;

---

[31] Copies of the letters are contained in the record on appeal. The letters differ in printing, punctuation, capitalization, and sentence structure. The first one, which contains a declaration under penalty of perjury but is unsigned, says defendant was not involved in the offense, and that Patterson would have taken the stand had the two been tried together. The second one, which bears a printed signature but no declaration under penalty of perjury, says Patterson was not completely truthful during his interrogation, but did admit he acted individually. It also says defendant was convicted of a crime of which he had no knowledge and in which he was not a participant. The letter says nothing about whether Patterson was prepared to testify in that regard.

see § 1181, subd. 8.)  "'[A] "probability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.  [Citations.]' [Citation.]" (*Soojian*, *supra*, at p. 519.)

"'[T]he trial court may consider the credibility as well as materiality of the evidence in its determination [of] whether introduction of the evidence in a new trial would render a different result reasonably probable.' [Citation.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 329.)  Although we recognize the issue before the trial court was not whether defendant should be granted a new trial, but merely a continuance to determine if grounds for one existed, we believe the court properly made a credibility assessment, and reasonably inferred a motion for a new trial would be unavailing even under the best case scenario for defendant, so a continuance would not be useful.[32]

Our research has disclosed two cases that are particularly instructive.  In *People v. Doolin*, *supra*, 45 Cal.4th 390, the defendant moved for a continuance, between the guilt and penalty phases of trial, in order to obtain retesting of DNA evidence and interview penalty phase witnesses.  The court denied the motion to continue, as well as the motion for release of the DNA evidence.  (*Id*. at p. 450.)  The California Supreme Court found no

---

**32**     During discussion of the request for continuance, the trial court remarked, following the prosecutor's assertion statements in the letters should not be deemed credible, "Since we're talking about supposed statements about court witnesses, I do recall Mr. McDonald indicated in his statement that the other two individuals both planned the robbery."  In light of the fact McDonald and defendant were tried separately, McDonald's statements (whether in the form of police interrogation or testimony at his own trial) would not be admissible in defendant's trial unless McDonald were willing to testify at that trial.  (*Crawford v. Washington* (2004) 541 U.S. 36, 51-54; *People v. Friend* (2009) 47 Cal.4th 1, 67; see Evid. Code, § 1291.)  Because he retained his Fifth Amendment privilege against self-incrimination, McDonald could not be compelled to testify until such time as his conviction became final on appeal.  (See *Mitchell v. United States* (1999) 526 U.S. 314, 326-327; *People v. Conerly* (2009) 176 Cal.App.4th 240, 252.)  In any event, we find nothing to suggest consideration of McDonald's statements improperly entered into the trial court's denial of defendant's request for a continuance, particularly in light of the court's comments after it read the letters.

abuse of discretion, because retesting DNA would not have been beneficial to the defendant in light of the extensive evidence linking him to each of the charged crimes. (*Id*. at p. 451.)

In *People v. Shoals* (1992) 8 Cal.App.4th 475 (*Shoals*), parole agents went to a motel to arrest Shoals and search his room. When they arrived, the door was opened by a woman, Jackie Levell. Shoals was in the shower. Drugs, cash, and a pager were found in the room, as were women's and children's clothes, and men's cologne and razors. Shoals had rented the room; he and Levell split the rent. (*Id*. at pp. 481-482.)

Shoals was charged with various drug-related offenses. (*Shoals*, *supra*, 8 Cal.App.4th at p. 482.) At trial, he planned to elicit from Levell testimony that the drugs belonged to her and she hid them from him when he visited. Levell, however, invoked her privilege against self-incrimination, as she had pled guilty on the first day of trial and was pending sentencing. Shoals then proffered one complete letter and two fragments of letters, in different handwriting, which he claimed Levell sent to him. Defense counsel represented that Levell personally wrote one letter, but dictated the other as she often did due to vision problems. The letters contained admissions that the motel room and drugs were Levell's, but defense counsel was unable to lay a foundation for their admission since Levell had invoked her privilege against self-incrimination and (Shoals having only given counsel the letters that morning) no witness was available to authenticate the handwriting of the letter purportedly written personally by Levell. The letters were not admitted into evidence, and Shoals presented no further defense. (*Id*. at p. 484.)

Shoals was convicted on two counts, and admitted various enhancements. (*Shoals*, *supra*, 8 Cal.App.4th at pp. 482-483.) At the hearing on his motion for a new trial, he presented a declaration under penalty of perjury from Levell that stated, in part, that she and two others had purchased the drugs for their personal use; Shoals did not know about the drugs or that they were hidden in the room; and Levell was not appealing her conviction and would testify to these facts if Shoals were granted a new trial. (*Id*. at

pp. 484-485.)  The trial court denied the motion on the basis Levell's declaration did not support the granting of a motion for a new trial.  (*Id*. at p. 485.)  The court further stated its ruling was based on a variety of reasons that it declined to enumerate on the record.  (*Ibid*.)

The appellate court held Levell's testimony was "newly discovered," because her invocation of the privilege against self-incrimination made her legally unavailable as a witness when Shoals attempted to call her at trial, and the failure to present her testimony was not the product of Shoals's lack of diligence.  (*Shoals*, *supra*, 8 Cal.App.4th at p. 487.)  Nevertheless, it found no abuse of discretion.  (*Ibid*.)  The court found Levell's affidavit did not contradict the strongest evidence introduced against Shoals, but rather at most created a conflict with the prima facie case made out by the prosecution.  (*Id*. at p. 488.)  Although Levell's affidavit was not cumulative, the clear thrust of the defense presented was that Shoals did not live in the motel room or have dominion and control over its contents.  Yet the evidence showed Shoals rented the room under a false name; had been seen coming and going from the room for almost a month; had received numerous telephone calls there; was unclothed at the time of his arrest and the only men's clothing in the room was his; and men's jewelry — inferentially his — was on the nightstand near two bindles of cocaine.  Other drugs were in plain sight in an open drawer in the nightstand.  (*Ibid*.)  Under the circumstances, the trial court acted reasonably in concluding it was not reasonably probable Levell's testimony would have affected the outcome of trial had it been presented to the jury.  (*Id*. at pp. 488-489.)

The situation in the present case is very similar to that in *Shoals*.  The thrust of the defense at trial was that defendant had no knowledge of what Patterson was going to do, and was not involved in the offense.  The prosecution presented ample evidence to the contrary.  The trial court, having had the opportunity to assess the credibility of witnesses and strength of the evidence for itself (compare *Shoals*, *supra*, 8 Cal.App.4th at p. 488 with *People v. Soojian*, *supra*, 190 Cal.App.4th at p. 522), reasonably could conclude that

testimony from a fellow gang member who admitted lying to police would be insufficient to render it probable at least one juror would vote to find defendant not guilty were the new evidence presented (see *id*. at p. 521), and so the requested continuance would not be useful. As the trial court's determination did not "exceed[] the bounds of reason, all of the circumstances being considered" (*People v. Giminez* (1975) 14 Cal.3d 68, 72), it did not err by denying defendant's motion for a continuance. It follows defendant's right to due process was not violated.

## DISPOSITION

The convictions on counts 2 and 3; the Penal Code section 186.22, subdivision (b) enhancement on count 2; and the prior serious felony, strike, and prison term enhancements are affirmed. The special circumstance finding as to count 1 is vacated and retrial is barred. The conviction on count 1 and related Penal Code section 186.22, subdivision (b) enhancement is reversed and the matter is remanded for further proceedings. Should the district attorney fail to give notice, within 30 days of the issuance of remittitur in this case, of intent to retry count 1 and the related gang enhancement, the trial court shall proceed to resentence defendant on the remaining counts and enhancements.

                                          _____

                                           DETJEN, Acting P.J.

WE CONCUR:

_____

FRANSON, J.

_____

PEÑA, J.